**LOTUS DEVELOPMENT CORPORATION,**
Plaintiff,

v.

**PAPERBACK SOFTWARE INTERNATIONAL and Stephenson Software, Limited, Defendants.**

**Civ. A. No. 87–76–K.**

United States District Court,
D. Massachusetts.

June 28, 1990.

Henry B. Gutman, Kerry L. Konrad, John S. Beckerman, Karen F. Conway, O'Sullivan Graev & Karabell, New York City, and Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, Mass., for Lotus Development Corp.

Lawrence G. Papale, Cannata, Genovese & Papale, San Francisco, Cal., and Edward C. Saltzberg, Warner & Stackpole, Boston, Mass., for Stephenson Software, Ltd.

Paul R. Gupta, David A. Guberman, Barbara O'Donnell, Brian C. Levey, Nereyda F. Garcia, Kenneth R. Berman, Sherin and Lodgen, Boston, Mass., and Walter G. Murphy, Peter C. Kober, Murphy, DeMarco & O'Neill, P.C., Boston, Mass., for Paperback Software Intern.

## OPINION
### TABLE OF CONTENTS

I. A Background Statement About Computers, Computer Programs, and Copyrightability .................................................. 42

II. Constitutional Constraints ............................................ 46

III. Congressional Mandates and Judicial Interpretation ...................... 46
 A. Sources of Guidance ............................................ 46
 1. Precedent on Determining Statutory Meaning ..................... 46
 2. The Statutory Language and the History of Amendments .......... 47
 a. Pre–1976 Legislation ....................................... 47
 b. The Copyright Act of 1976 .................................. 47
 c. CONTU and the 1980 Amendments ........................ 49
 3. Relevant Aspects of the Whole Law of Copyright ................ 51
 a. "Nonliteral" Expression ........................................ 51
 b. "Useful Articles" ........................................... 52
 4. The Objects and Policies of Copyright Law ...................... 52
 B. The Idea–Expression and Useful–Expressive Distinctions .............. 53

IV. The Legal Test for Copyrightability Applicable to This Case .............. 54
 A. Functionality, Useful Articles, and the Useful–Expressive Distinction..... 54
 B. The Idea–Expression Riddle: Four Additional Concepts ............... 58
 C. Elements of the Legal Test for Copyrightability....................... 59
 D. Incentives and the Role of Advocacy ................................ 62

V. Application of the Legal Test to Lotus 1–2–3 ........................... 62
 A. "Look and Feel"................................................. 62
 B. The User Interface ............................................... 63
 C. Elements of the User Interface as Expression ........................ 65

VI. Copying of Lotus 1–2–3 ............................................... 68
VII. A Postscript on the Nature of Decisionmaking in This Case .............. 71
 A. Policy Arguments and Limitations on the Role of Courts ............. 71
 B. Strained Analogies and Word Games............................... 71
 C. Policy Arguments for Bright–Line Rules ............................ 73
 D. Opinion Evidence and Premises of Legal Rulings..................... 73
 E. Defendants' Policy Arguments Founded On the OTSOG Principle ..... 77

VIII. Other Defenses ...................................................... 79
 A. Lack of Subject Matter Jurisdiction ................................ 79
 B. Laches and Equitable Estoppel .................................... 82

IX. Reserved Rulings on Objections ........................................ 83
ORDER ..................................................................... 84

Appendices .............................................................. 85–87

KEETON, District Judge.

██ The expression of an idea is copyrightable. The idea itself is not. When applying these two settled rules of law, how can a decisionmaker distinguish between an idea and its expression?

Answering this riddle is the first step—but only the first—toward disposition of this case in which the court must decide, among other issues, (1) whether and to what extent plaintiff's computer spreadsheet program, Lotus 1–2–3, is copyrightable, (2) whether defendants' VP–Planner was, on undisputable facts, an infringing work containing elements substantially similar to copyrightable elements of 1–2–3, and (3) whether defendants' proffered jurisdictional and equitable defenses are meritorious.

Phase One of this case was tried to the bench. By agreement of the parties, in Phase One, the court shall

> resolve all legal and factual issues concerning the liability, if any, of defendants ... for the claims of copyright infringement brought by plaintiff ... and all defenses thereto, including but not limited to all factual and legal issues concerning the copyrightability of Lotus' Works [1–2–3, releases 1.0, 1A, and 2.0], and *excluding only:* (1) issues of fact, if any, requiring jury determination concerning defendants' alleged copying of any protected expression from Lotus' Works in Defendants' Works [VP–Planner and VP–Planner Plus]; [and] (2) factual issues concerning defendants' possible copying of the source or object code for Lotus' Works....

Stipulation and Order Regulating Phased Trial, § I(A) (Docket No. 246).[1]

This Opinion sets forth findings of fact and conclusions of law that are central to deciding this controversy. Fed.R.Civ.P. 52(a). The court adopts, as additional findings, all proposed findings to which no party objected. *See* Docket Nos. 250, 251.

The outcome of this case depends on how this court, and higher courts on appeal, should answer a central question about the scope of copyrightability of computer programs. For the reasons explained in this Opinion, I conclude that this question must be resolved in favor of the plaintiff, Lotus.

## I. A BACKGROUND STATEMENT ABOUT COMPUTERS, COMPUTER PROGRAMS, AND COPYRIGHTABILITY

Though their influence in our society is already pervasive, digital computers—along with computer "programs" and "user interfaces"—are relatively new to the market, and newer still to litigation over "works" protected by intellectual property law.

Digital computers (hereinafter referred to as "computers") are machines currently used to perform three types of functions electronically: (1) arithmetic calculations; (2) logical operations (*e.g.,* comparing values to determine whether one is larger); and (3) storage and display of the results. Because computers can perform millions of operations of these types in a single second, they can be used to solve problems too complex, or too repetitious and boring, to be solved manually. Developments to the current state of the art have already transformed many areas of business, educational, and recreational activity, and they support speculations about more striking achievements in the future.

---

1. This case was originally consolidated with *Lotus Development Corporation v. Mosaic Software,* Civil Action No. 87–74–K, which involves Mosaic's computer spreadsheet program The Twin. Although Phase One of this case was intended to resolve certain additional legal and

factual issues concerning the liability of Mosaic Software for plaintiff's claims of copyright infringement, that case was severed on the second day of this first phase of trial for reasons not here relevant. *See* Docket No. 174 (February 8, 1990).

A personal computer system consists of hardware and software. The hardware includes the central processing unit ("CPU"), which contains the electronic circuits that control the computer and perform the arithmetic and logical functions, the internal memory of the computer ("random access memory," or "RAM"), input devices such as a keyboard and mouse, output devices such as a display screen and printer, and storage devices such as hard and floppy disk drives. The software includes one or more computer programs, usually stored magnetically on hard or floppy disks, along with such items as instruction manuals and "templates," which are pieces of plastic that fit around the function keys on the keyboard, identifying the specific functions or commands that can be invoked by those keys. A personal computer system can also include "firmware," or "microcode":

> Microcode is a set of encoded instructions ... that controls the fine details of the execution of one or more primitive functions of a computer. Microcode serves as a substitute for certain elements of the hardware circuitry that had previously controlled that function.

Samuelson, *CONTU Revisited: The Case Against Copyright Protection for Computer Programs in Machine–Readable Form,* 1984 Duke L.J. 663, 677.

Computer programs are, in general, divided into two types: operating system programs and application programs. Operating system programs—such as DOS, XENIX, and OS/2—are programs that control the basic functions of the computer hardware, such as the efficient utilization of memory and the starting and stopping of application programs. Application programs are programs that permit a user to perform some particular task such as word processing, database management, or spreadsheet calculations, or that permit a user to play video games.

This case concerns two competing application programs—Lotus 1–2–3 and VP–Planner—which are primarily spreadsheet programs, but which also support other tasks such as limited database management and graphics creation. Programs such as these, because they can perform several different kinds of tasks, are called "integrated" application programs.

Congress has defined "computer program" as follows:

> A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

17 U.S.C. § 101 (1988). This "set of statements or instructions," in its literal or written manifestation, may be in the form of object code or source code. It may also be represented, in a partially literal manifestation, by a flowchart. A copyrightable work designed for use on a computer may include, as well, text that appears, for example, in a problem manual or a manual of instructions. These elements of text, however, ordinarily are not referred to in the industry as part of a "computer program" unless they appear on the computer screen and serve a purpose like that of the components of a "help screen" available to a user whenever needed. Elements of this textual type are not at issue in this phase of this case.

Computer programs are typically written in some form of computer programming "language." The "lowest"-level computer programming language is machine language, which is a binary language written in "bits" (*BI* nary digi*TS* ). Each bit is equal to one binary decision—that is, to the designation of one of two possible and equally likely values, such as an "on"-"off" or "yes"—"no" choice. These binary decisions, the only kind that a typical computer can understand directly, are commonly represented by 0's and 1's. A sequence of eight bits (which allows 256 unique combinations of bits) is commonly called a "byte" ("by eight"), and 1024 bytes form a "kilobyte" (commonly referred to as "K," *e.g.,* sixty-four kilobytes is "64K"). Machine language may also be represented in hexadecimal form, rather than in binary form, by the characters 0–9 and A–F, where "A" represents 10, "B" represents 11, and so on through "F," which represents "15." In hexadecimal machine language, only two rather than eight characters are required

to allow for 256 unique combinations (*e.g.*, 37 instead of 00110111, each of which represents the 55th of 256 combinations; 7B instead of 01111011, each of which represents the 123rd of 256 combinations; EA instead of 11101010, each of which represents the 234th of 256 combinations). The computer is able to translate these hexadecimal instructions into binary form. Other versions of machine language are represented in decimal (0–9) and octal (0–7) form.

An object program, or object code, is a program written in machine language that can be executed directly by the computer's CPU without need for translation. For example, in the machine language of a certain computer, the instructions to divide the value in "B" by the value in "C" and add that number to the value in "A" may be represented by the following sequence of instructions (in binary form):

0010000000010001; 1000000011010010; 1101000000010000.

An "intermediate"-level programming language is assembly language. Rather than in bits, assembly code is written in simple symbolic names, or alphanumeric symbols, more easily understandable by human programmers. For example, the calculation described above may be represented, in the assembly language of a certain computer, as follows:

LOAD B; DIV C; ADD A.

Because of the primitive nature of assembly language, even relatively simple computations can require long and complex programs.

During the early period of computing, "programmers" ordinarily wrote programs exclusively in machine language. Today, object code is rarely written directly by computer programmers. Rather, modern programmers typically write computer programs in a "higher"-level programming language. These programs are called source programs, or source code. Although "source code" has been defined far more broadly in some of the literature in the field, and in some of the expert testimony in this case, more commonly the term "source code" refers to a computer program written in some programming language—such as FORTRAN (*FOR* mula *TRAN* slation), COBOL (*CO* mmon *B* usiness *O* riented *L* anguage), Pascal, BASIC, or C—that uses complex symbolic names, along with complex rules of syntax. In a typical higher-level programming language, for example, the above-described computation—that is, (A) + (B/C)—might be represented as follows:

A + B/C.

Unlike machine language, which is unique to each kind of CPU and which is executed directly by the computer, source code programming languages are universal to almost all computers. As a consequence, source code is executed indirectly. Thus, a program written in source code must be translated into the appropriate object code for execution in one type of computer, and into a different object code for execution in another type of computer. The translation can be effectuated by an "interpreter" program or by a "compiler" program. An "interpreter" program is a simultaneous translator that works in conjunction with the application program every time the application program is run, carrying out the instructions of the program one step at a time. In contrast, a "compiler" program translates the program once and for all nto machine language, after which the translated program can be executed directly by the CPU without the need for any further resort to the compiler. A distinctive "interpreter" or "compiler" program is available for each type of source code programming language and each type of CPU.

A partly literal and partly pictorial manifestation of a computer program, still farther removed from direct use with the computer, is the flowchart. A flowchart is a graphic representation of a computer program that is written in symbols, rather than in bits or symbolic names, and with a syntax that is graphic rather than grammatical. *See, e.g.,* Breyer, *The Uneasy Case for Copyright: A Study of Copyright in Books, Photocopies, and Computer Programs,* 84 Harv.L.Rev. 281, 341 n. 235 (1970) (providing simple flowchart). A flowchart can be thought of as a kind of

symbolic outline or schematic representation of a computer program's logic, which is written by a programmer once he or she has a conceptualization of the goals of the program. Creating a flowchart (at least, an early draft) is thus, typically, an early phase in the development of a software system, which is followed by the translation of the flowchart into source code. *See* Menell, *An Analysis of the Scope of Copyright Protection for Application Programs*, 41 Stan.L.Rev. 1045, 1051 (1989) (identifying five stages in the development of most application programs: (1) defining the desired task; (2) flowcharting; (3) encoding; (4) debugging; and (5) preparing documentation). On computers and computer programs in general, *see* Lewis Affidavit, ¶¶ 18–42 (Docket No. 274); Galler Declaration, ¶¶ 8–20 (Docket No. 257); A. Clapes, *Software, Copyright & Competition: The "Look and Feel" of the Law* 47–64 (1989); R. Bradbeer, P. DeBono & P. Laurie, *The Beginner's Guide to Computers* (1982); *McGraw–Hill Dictionary of Scientific and Technical Terms* (3d ed. 1984).

██ The parties agree, as a general proposition, that literal manifestations of a computer program—including both source code and object code—if original, are copyrightable. *Stern Electronics, Inc. v. Kaufman*, 669 F.2d 852, 855 n. 3 (2d Cir. 1982) ("written computer programs are copyrightable as literary works"); *Williams Electronics Inc. v. Artic International, Inc.*, 685 F.2d 870, 876–77 (3d Cir.1982) (object code copyrightable); *Hubco Data Products, Corp. v. Management Assistance Inc.*, 219 U.S.P.Q. 450, 454 (D.Id.1983) (same); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1243 (3d Cir.1983) (source and object code copyrightable), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *GCA Corp. v. Chance*, 217 U.S.P.Q. 718, 720 (N.D.Cal.1982) (same); *Midway Manufacturing Co. v. Strohon*, 564 F.Supp. 741, 750 (N.D.Ill.1983) (same); *Digital Communications Associates, Inc. v. Softklone Distributing Corp.*, 659 F.Supp. 449, 454 (N.D.Ga.1987) (same). Also, it appears that flowcharts, if sufficiently de-

tailed and original, are entitled to copyright protection:

> Flowcharts ... are works of authorship in which copyright subsists, provided they are the product of sufficient intellectual labor to surpass the "insufficient intellectual labor hurdle"....

National Commission on New Technological Uses of Copyrighted Works, *Final Report and Recommendations* 43 (1978) (hereinafter *"Final Report"*), *reprinted in* 5 *Copyright, Congress and Technology: The Public Record* (N. Henry, ed.1980), *cited with approval in Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.*, 797 F.2d 1222, 1241 (3d Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987). *See also Synercom Technology, Inc. v. University Computing Co.*, 462 F.Supp. 1003, 1013 n. 5 (N.D.Tex. 1978) (although taking a very narrow view of the scope of copyrightability of nonliteral elements of computer programs, court nevertheless noted in *obiter dictum* that "it would probably be a violation to take a detailed description of a particular problem solution, such as a flowchart ... and program such a description in computer language") (Higginbotham, J.); *Data Cash Systems, Inc. v. JS & A Group, Inc.*, 480 F.Supp. 1063, 1067 n. 4 (N.D.Ill.1979) (holding that copyright protection extends "to computer programs in their flow chart, source and assembly phases but not in their object phase," court concluded that computer program written in object code was not copyrightable), *aff'd on other grounds*, 628 F.2d 1038 (7th Cir.1980) (program at issue not copyrightable because publication without notice forfeited any copyright protection); *Williams v. Arndt*, 626 F.Supp. 571, 578 (D.Mass.1985) (violation to take detailed prose description and program such description in source code).

Defendants vigorously dispute, however, the copyrightability of any nonliteral elements of computer programs. That is, defendants assert that only literal manifestations of computer programs are copyrightable. Plaintiff, on the other hand, maintains that copyright protection extends to all elements of computer programs that embody

original expression, whether literal or non-literal, including any original expression embodied in a program's "user interface."

One difficulty with plaintiff's argument is the amorphous nature of "nonliteral" elements of computer programs. Unlike the written code of a program or a flow-chart that can be printed on paper, nonliteral elements—including such elements as the overall organization of a program, the structure of a program's command system, and the presentation of information on the screen—may be less tangibly represented. Whether these elements are copyrightable, and if so, how the nonliteral elements that are copyrightable may be identified, are central to deciding this case.

## II. CONSTITUTIONAL CONSTRAINTS

In considering the legal issues relevant to whether nonliteral elements of Lotus 1-2-3 are copyrightable, and if so, to what extent, one may appropriately begin with a provision of the Constitution of the United States:

> The Congress shall have Power ... To promote the Progress of Science ... by securing for limited Time to Authors ... the exclusive Right to their ... Writings....

U.S. Const., Art. I, § 8, cl. 8. The copyright law, codified in Title 17 of the United States Code, rests upon this explicit grant of legislative authority.

Under this constitutional mandate, Congress has broad though not unlimited authority to grant copyright monopolies as needed to promote progress. If Congress were to determine, for example, that copyright protection is unnecessary to "promote the Progress of" computer programming—because, for example, in Congress' view the financial incentives alone of developing new computer programs (without the added benefit of copyright) are enough to encourage innovation, or because incremental innovation might be stifled by expansive copyright protection—then Congress could, without offending the Constitution, provide no copyright protection for computer programs. At the other extreme, were Congress to find that strong copyright protec-

tion is necessary to promote the progress of computer programming, Congress could provide for expansive copyright protection for all aspects of computer programs, again without having strayed beyond the bounds of the constitutionally permissible.

Because the constitutional grant of power authorizes Congress to take either path—or to chart some middle course—this case does not raise constitutional issues. Rather, the issues at stake here are issues of statutory meaning. The central question is not whether Congress could render nonliteral elements such as those of 1-2-3 copyrightable, but whether it has done so. *Banks v. Manchester, Ohio,* 128 U.S. 244, 252, 9 S.Ct. 36, 39, 32 L.Ed. 425 (1888) ("No authority exists for obtaining a copyright beyond the extent to which Congress has authorized it. A copyright cannot be sustained as a right existing at common law; but, as it exists in the United States, it depends wholly on the legislation of Congress.").

## III. CONGRESSIONAL MANDATES AND JUDICIAL INTERPRETATION

### A. Sources of Guidance

1. Precedent on Determining Statutory Meaning

In *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (Powell, J., joined by Rehnquist, C.J., and Brennan, White, Blackmun, O'Connor, and Scalia, JJ.), the Supreme Court explained the various sources of guidance to which a court should look in determining the manifested meaning of a statute and the manifestations of congressional intent:

> [T]he "starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756 [95 S.Ct. 1917, 1935, 44 L.Ed.2d 539] (1975) (Powell, J., concurring). But the text is only the starting point. As Justice O'Connor explained last Term, " ' "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and

policy." ' " *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 221 [106 S.Ct. 2485, 2493, 91 L.Ed.2d 174] (1986) (quoting *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 285 [76 S.Ct. 349, 359, 100 L.Ed. 309] (1956) (in turn quoting *United States v. Heirs of Boisdoré,* 8 How. [49 U.S.] 113, 122 [12 L.Ed. 1009] (1850))). *Id.* at 43, 107 S.Ct. at 358. Accordingly, to determine whether Congress has extended copyright protection to nonliteral elements of computer programs, and if so, to what extent, a court must examine, first, the relevant language of the copyright statutes, second, "the provisions of the whole law," and third, "its object and policy." *Id.*

Examination of these sources exposes mandates inconsistent with the principal argument advanced by defendants—that copyright protection extends only to literal manifestations of computer programs and not to any nonliteral elements. Close examination also discloses that Congress has not explicitly addressed some of the questions that must be decided in this case. In these circumstances, it is appropriate to consider legislative history as well as statutory text.

2. The Statutory Language and the History of Amendments

a. *Pre–1976 Legislation*

The First Congress extended copyright protection to "any map, chart, book or books already printed." Act of May 31, 1790, ch. 15, § 1, 1 Stat. 124, 124 (repealed 1831). Congress quickly expanded this limited scope of copyright protection, adding designs, prints, etchings and engravings in 1802, "musical composition" in 1831, "dramatic composition" in 1856, "photographs and the negatives thereof" in 1865, and "statuary" and "models or designs intended to be perfected as works of the fine arts" in 1870. Act of Apr. 29, 1802, ch. 36, § 2, 2 Stat. 171, 171, *repealed by* Act of Feb. 3, 1831, ch. 16, §§ 1, 14, 4 Stat. 436, 436, 439, *amended by* Act of Aug. 18, 1856, ch. 169, 11 Stat. 138, 139, *amended by* Act of Mar. 3, 1865, ch. 126, §§ 1, 2, 13 Stat. 540, 540, *repealed by* Act of July 8, 1870,

ch. 180, § 86, 16 Stat. 198, 212 (repealed 1909).

In 1909, Congress abandoned the effort to list exhaustively all works in which copyright may subsist, instead adopting a more generalized approach to copyrightability:

The works for which copyright may be secured under this title shall include *all the writings of an author.*

Act of Mar. 4, 1909, ch. 320, § 4, 35 Stat. 1075, 1076 (emphasis added) (previously codified at 17 U.S.C. § 4, *reprinted in* 17 U.S.C.A. App. § 4 (West Supp.1990); recodified 1947; repealed 1976). To clarify the meaning of "all the writings of an author," Congress also provided a non-exclusive list of examples. *Id.* at § 5 (listing the various kinds of works previously entitled to explicit copyright protection). Even this generalized statement of the scope of copyrightability along with the explanatory list proved inadequate. In 1912, Congress added "motion pictures" as a further example of "all the writings of an author," Act of Aug. 24, 1912, ch. 356, § 5(1)–(m), 37 Stat. 488, 488 (previously codified at 17 U.S.C. § 5(1)–(m), *reprinted in* 17 U.S.C.A. App. § 5(1)–(m); recodified 1947; repealed 1976), and in 1972, Congress added "sound recordings" to the list, Act of Oct. 15, 1971, Pub.L. 92–140, § 1(b), 85 Stat. 391, 391 (previously codified at 17 U.S.C. § 5(n), *reprinted in* 17 U.S.C.A. App. § 5(n); repealed 1976).

In 1955, Congress began to consider another major revision of the copyright law. After twenty years of hearings, study, debate, and redrafting, that revision was signed into law in 1976. Act of Oct. 19, 1976, Pub.L. 94–553, 90 Stat. 2541 (codified at 17 U.S.C. §§ 101 *et seq.*). That law—the Copyright Act of 1976—and the 1980 amendments to the Act provide the relevant statutory mandates for this case.

b. *The Copyright Act of 1976*

Like the Copyright Act of 1909, the Copyright Act of 1976 eschews the prescription of an exclusive list of the kinds of works that are copyrightable:

Copyright protection subsists, in accordance with this title, in *original works of*

**48**

*authorship* fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

17 U.S.C. § 102(a) (1988) (emphasis added).

■ It is axiomatic that the designation "original" is not intended to be limited to works that are novel or unique. Rather, the word "original," which was "purposely left undefined" by Congress, refers to works that have been "independently created by an author," regardless of their literary or aesthetic merit, or ingenuity, or qualitative value. H.R.Rep. No. 1476, 94th Cong., 2d Sess. 51, *reprinted at* 1976 U.S. Code Cong. & Admin. News 5659, 5664 (hereinafter "House Report"); *Hutchinson Telephone Co. v. Fronteer Directory Co.,* 770 F.2d 128, 131 (8th Cir.1985); *Puddu v. Buonamici Statuary, Inc.,* 450 F.2d 401, 402 (2d Cir.1971) ("originality has been considered to mean 'only that the work owes its *origin* to the author'") (emphasis added; *quoting* Nimmer, *Copyright* § 10 at 32 (1971 ed.)). *See also Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 251, 23 S.Ct. 298, 300, 47 L.Ed. 460 (1903) (Holmes, J.) ("It would be a dangerous undertaking for persons trained only in the law to constitute themselves final judges of the worth of" a work.).

■ Also, the designation "works of authorship" is not meant to be limited to traditional works of authorship such as novels or plays. Rather, Congress used this phrase to extend copyright to new methods of expression as they evolve:

The history of copyright law has been one of gradual expansion in the types of works accorded protection, and the subject matter affected has fallen into two general categories. In the first, scientific discoveries and technological developments have made possible new forms of creative expression that never existed before. In some of these cases the new expressive forms—electronic music, filmstrips, and *computer programs,* for example—could be regarded as an extension of copyrightable subject matter Con-

gress had already intended to protect, and were thus considered copyrightable from the outset without need of new legislation. In other cases, such as photographs, sound recordings, and motion pictures, statutory enactment was deemed necessary to give them full recognition as copyrightable works.

Authors are continually finding new ways of expressing themselves, but it is impossible to foresee the forms that these new expressive methods will take. The bill does not intend either to freeze the scope of copyrightable subject matter at the present stage of communications technology or to allow unlimited expansion into areas outside the present congressional intent.

House Report at 51, *reprinted at* 5664 (emphasis added).

■ To help illumine the meaning of "works of authorship," Congress, as it had done in the 1909 Act, again provided a statutory list of examples of those kinds of works that, if original, merit copyright protection:

Works of authorship include the following categories: (1) literary works; (2) musical works, including any accompanying words; (3) dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisual works; and (7) sound recordings.

17 U.S.C. § 102(a) (1988). This listing was intended to be " 'illustrative and not limitative,' and ... the seven categories do not necessarily exhaust the scope of 'original works of authorship' that the bill is intended to protect." House Report at 53, *reprinted at* 5666. Consequently, in addition to these explicitly-listed items, courts have extended copyright protection to such works as artistic features of masquerade costumes, *National Theme Productions, Inc. v. Jerry B. Beck, Inc.,* 696 F.Supp. 1348, 1354 (S.D.Cal.1988); the arrangement of public-domain legal decisions in reporters, *West Publishing Co. v. Mead Data Central, Inc.,* 799 F.2d 1219 (8th Cir.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962,

93 L.Ed.2d 1010 (1987); telephone books, *Southern Bell Telephone & Telegraph Co. v. Associated Telephone Directory Publishers,* 756 F.2d 801 (11th Cir.1985); televised news reports, *Pacific and Southern Co. v. Duncan,* 744 F.2d 1490, 1494, *reh'g denied,* 749 F.2d 733 (11th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985); blank answer sheets for use with student achievement and intelligence tests that are designed to be corrected by optical scanning machines, *Harcourt, Brace & World, Inc. v. Graphic Controls Corp.,* 329 F.Supp. 517 (S.D.N.Y.1971) (applying the 1909 Act); maps, *C.S. Hammond & Co. v. International College Globe, Inc.,* 210 F.Supp. 206, 216 (S.D.N.Y. 1962) (applying the 1909 Act); and a code book for cable correspondence consisting of 6,325 coined, otherwise meaningless, words of five letters each, *Reiss v. National Quotation Bureau, Inc.,* 276 F. 717 (S.D.N.Y. 1921) (L. Hand, J.) (applying the 1909 Act).

■ Although Congress did not include "computer programs" in this list of examples of "works of authorship," computer programs fall squarely within the statutory definition of literary works:

> "Literary works" are works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied.

17 U.S.C. § 101 (1988). *See also* House Report at 54, *reprinted at* 5667 ("[t]he term 'literary works' ... includes ... computer programs") *id.* at 51, *reprinted at* 5664 ("computer programs ... were ... considered copyrightable from the outset"); *id.* at 116, *reprinted at* 5731 (1976 Act governs "copyright-ability [sic] of computer programs").

Like all other works of authorship, however, computer programs, even if certain elements of them are copyrightable, are not entitled to an unlimited scope of copyright protection. Most relevant to this case is the following limitation:

> In no case does copyright protection for an original work of authorship extend to any *idea, procedure, process, system, method of operation, concept, principle, or discovery,* regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b) (1988) (emphasis added). Noting that this section applies to computer programs, the House Report declares: "Section 102(b) is intended, among other things, to make clear that the *expression* adopted by the programmer is the copyrightable element in a computer program, and that the actual *processes or methods* embodied in the program are not within the scope of the copyright law." *House Report* at 57, *reprinted at* 5670 (emphasis added); *see also id.* at 54, *reprinted at* 5667 (computer programs are copyrightable only "to the extent that they incorporate authorship in the programmer's *expression* of original ideas, as distinguished from the *ideas* themselves") (emphasis added).

### c. *CONTU and the 1980 Amendments*

Most contemporaneous observers expected that the bill that eventually became the Copyright Act of 1976 would apply to computer programs. Toward the end of the twenty-year process of reconsidering the copyright law, however, Congress recognized that certain problems raised by computer and other new technologies were not adequately addressed in the pending bill. *See* House Report at 116, *reprinted at* 5731. Accordingly, in 1974, Congress created the National Commission on New Technological Uses of Copyrighted Works ("CONTU"). Congress gave the Commission the following mandate:

> (b) The purpose of the Commission is to study and compile data on:
>
> (1) the reproduction and use of copyrighted works of authorship—
>
> (A) in conjunction with automatic systems capable of storing, processing, retrieving, and transferring information....
>
> (c) The Commission shall make recommendations as to such changes in copyright law or procedures that may be necessary to assure for such purposes ac-

cess to copyrighted works, and to provide recognition of the rights of copyright owners.

Act of Dec. 31, 1974, Pub.L. 93–573, § 201(b)–(c), 88 Stat. 1873, 1873–74 (1974).

It took seven months after enactment of the bill to constitute the Commission and appoint the Commissioners. Because of this delay, CONTU did not begin its deliberations until October 1975, and did not release its report and recommendations until July 1978, almost two years after the passage of the 1976 Act.

CONTU observed a need for copyright protection of creative expression embodied in computer programs:

> The cost of developing computer programs is far greater than the cost of their duplication. Consequently, computer programs ... are likely to be disseminated only if ... [t]he creator can spread its costs over multiple copies of the work with some form of protection against unauthorized duplication of the work.... The Commission is, therefore satisfied that some form of protection is necessary to encourage the creation and broad distribution of computer programs in a competitive market, ... [and] that the continued availability of copyright protection for computer programs is desirable.

CONTU, *Final Report* at 20–21. Concluding, however, that the Act of 1976 already provided adequate protection, CONTU did not propose any statutory changes with respect to *copyrightability* of computer programs. On the other hand, CONTU did propose two amendments with respect to *permissible copying* of computer programs. These proposed amendments were subsequently adopted by Congress with only minor modifications and with little additional legislative history.

First, tracking verbatim CONTU's recommendation, Congress amended section 101 to include the following definition:

> A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

Act of Dec. 12, 1980, Pub.L. 96–517, 94 Stat. 3015, 3028 (codified at 17 U.S.C. § 101). Second, Congress also followed CONTU's recommendation by amending section 117 to allow the owner of a computer program to make additional copies or adaptations of the program:

> Notwithstanding the provisions of section 106 [which grants the copyright owner the exclusive rights to reproduce the copyrighted work], it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:
>
> (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or
>
> (2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.
>
> Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program. Adaptations so prepared may be transferred only with the authorization of the copyright owner.

*Id.* (codified at 17 U.S.C. § 117).

Finally, although the Commission did not address explicitly the central issue of the present case—whether copyright protection extends to the nonliteral elements of computer programs at issue here—CONTU did re-emphasize, for purposes of copyrightability of computer programs, the fundamental distinction between copyrightable expression on the one hand, and noncopyrightable methods, processes and ideas on the other. *Id.* at 37–46. Indeed, although his personal views are entitled to very little if any weight in the context of the court's determination of the statutory mandates, *Whelan*, 797 F.2d at 1241, n. 37, it is interesting to note that Melville Nimmer, Vice-Chairperson of CONTU, testified about the

Commission's intent, in *Evergreen Consulting v. NCR Comten, Inc.*, No. 82–5946–KN (C.D.Cal. filed 1982). According to Nimmer, CONTU understood that the proposed repeal of former section 117 would extend copyright protection to nonliteral elements of computer programs:

> CONTU had no views, and made no recommendations which would negate the availability of copyright protection for the detailed design, structure and flow of a [computer] program under the copyright principles that make copyright protection available, in appropriate circumstances, for the structure and flow of a novel, a play or a motion picture.

Nimmer Decl. in *Evergreen Consulting*, ¶ 28, *reprinted in* Note, *Idea, Process, or Protected Expression?: Determining the Scope of Copyright Protection of the Structure of Computer Programs*, 88 Mich.L.Rev. 866, 889 (1990). *But cf.* conflicting views of Commissioner Arthur Miller and Executive Director Arthur Levine, discussed in *id.* at 888–90.

### 3. Relevant Aspects of the Whole Law of Copyright

#### a. *"Nonliteral" Expression*

■ With respect to such things as musical, dramatic, and motion picture works, and works of "literature" (as contrasted with "literary" works in the broader statutory sense, *see* Samuelson, *Reflections on the State of American Software Copyright Law and the Perils of Teaching It*, 13 Colum.–VLA J.L. & Arts 61, 65 n. 15 (1988)), it is crystal clear that, to the extent original, the literal manifestations of such works are protected by copyright. Thus, during a period of copyright protection, one cannot copy an author's book, score, or script without authorization in law or in fact. It is also well settled that a copyright in a musical, dramatic, or motion picture work, or a work of literature, may be infringed even if the infringer has not copied the literal aspects of the work. That is, even if an infringer does not copy the words or dialogue of a book or play, or the score of a musical work, infringement may be found if there is copying of the work's expression of setting, characters, or plot with a resulting substantial similarity. *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir.1930) (L. Hand, J.) ("the right cannot be limited literally to the text, else a plagiarist would escape by immaterial variations"), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931); *Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d 49, 55 (2d Cir.) (L. Hand, J.) ("a play may be pirated without using the dialogue"), *cert. denied*, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936); *Detective Comics, Inc., v. Bruns Publications, Inc.*, 111 F.2d 432, 433 (2d Cir.1940) (defendant's comic book "Wonderman" adjudged to infringe plaintiff's copyright in the comic book series "Superman" where both comic books' central characters have miraculous strength and speed; conceal their strength, along with their skin-tight acrobatic costumes, beneath ordinary clothing; are termed champions of the oppressed; crush guns; stop bullets; and leap over or from buildings); *Bradbury v. Columbia Broadcasting System, Inc.*, 287 F.2d 478, 482–84 (9th Cir.) (twenty-two nonliteral similarities between plaintiff's *Fahrenheit 451* and *The Fireman* and defendants' television production), *cert. dismissed*, 368 U.S. 801, 82 S.Ct. 19, 7 L.Ed.2d 15 (1961); *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106 (9th Cir.1970) (substantial similarity between nonliteral expressive elements embodied in defendant's cards and plaintiff's cards); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir.1977) (defendant's television commercial substantially similar in locale, characters, and plot to plaintiff's children's television series); *Twentieth Century–Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327 (9th Cir.1983) (thirteen alleged similarities between plaintiff's motion picture, *Star Wars*, and defendant's motion picture and derivative television series, *Battlestar: Gallactica*—including totality of setting, characters and their relationships, and elements of plot—were sufficient to create genuine dispute of material fact to defeat defendant's motion for summary judgment); *Horgan v. Macmillan, Inc.*, 789 F.2d 157, 162 (2d Cir.1986) (copy-

right in choreography for *The Nutcracker* ballet may be infringed by a book of photographs of the ballet if the series of photographs is substantially similar to the ballet). *See also Stewart v. Abend,* —— U.S. ——, 110 S.Ct. 1750, 1759, 109 L.Ed.2d 184 (1990) (noting that a motion picture may infringe a book by using "the story's unique setting, characters, plot, and sequence of events"). This type of copying of nonliteral expression, if sufficiently extensive, has never been upheld as permissible copying; rather, it has always been viewed as copying of elements of an expression of creative originality.

### b. *"Useful Articles"*

 A "useful article" is defined by the Copyright Act as

an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article."

17 U.S.C. § 101 (1988). Such articles—or more accurately, the utilitarian aspects of such articles—are not works of authorship in which copyright can subsist. House Report at 55, *reprinted at* 5668. However:

[T]he design of a useful article ... shall be considered a pictorial, graphic, or sculptural work [which *is* copyrightable] ... if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

17 U.S.C. § 101 (1988) (defining "pictorial, graphic, and sculptural works"). Put more broadly, the point is that those elements of a useful article that can exist independently of the utilitarian aspects of the article are potentially copyrightable because those elements are elements of *expression* that can be distinguished from the utilitarian functions of the article. *See Whelan,* 797 F.2d at 1236 ("the purpose or function of a utilitarian work [is] the work's idea, and everything that is not necessary to that purpose or function [is] part of the expression of the idea"); *Williams Electronics, Inc. v. Bally Manufacturing Corp.,* 568 F.Supp. 1274, 1279–80 (N.D.Ill.1983) (Congress intended to exclude from copyright protection functional elements of work, leaving only those aspects of work separable from utilitarian aspects copyrightable).

### 4. The Objects and Policies of Copyright Law

The court's final task in divining the statutory mandates is to look to the "object and policy" of the copyright law. *Kelly,* 479 U.S. at 43, 107 S.Ct. at 358. This inquiry has received heightened attention in this case (*see* Part VII, *infra*) because defendants contend that extending copyright protection to nonliteral elements of computer programs is contrary to the objects and policies of copyright law as expressed in the copyright statute and in precedents. Although, of course, disputing defendants' conclusion, plaintiff does not contest the premise of this contention— that in construing the manifested meaning of the Copyright Act, the court is directed to look to the "object and policy" of the copyright law.

Copyright monopolies are not granted for the purpose of rewarding authors. Rather, Congress has granted copyright monopolies to serve the public welfare by encouraging authors (broadly defined) to generate new ideas and disclose them to the public, being free to do so in any uniquely expressed way they may choose. *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 546, 105 S.Ct. 2218, 2223, 85 L.Ed.2d 588 (1985). As the Supreme Court has concluded, "encouragement of individual effort by personal gain is the best way to advance public welfare through talents of authors and inventors in 'Science and useful Arts.'" *Mazer v. Stein,* 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 *reh'g denied,* 347 U.S. 949, 74 S.Ct. 637, 98 L.Ed. 1096 (1954). *See also Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 432, 104 S.Ct. 774, 783, 78 L.Ed.2d 574 (1984) (" 'The immediate effect of our copyright law is to secure a fair return for an "author's" creative labor. But the ultimate aim is, by this incentive,

to stimulate artistic creativity for the general public good.' ") (*quoting Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 2043, 45 L.Ed.2d 84 (1975)).

In construing the relevant statutory mandates, the court must be faithful to the statutory language and mindful of both the ultimate goal of copyright law—the advancement of public welfare—and Congress' chosen method of achieving this goal—private reward to the individual author. Courts should not draw the line between copyrightable and non-copyrightable elements of computer programs in such a way as to harm the public welfare, nor should courts ignore the accommodation struck by Congress in choosing to advance the public welfare by rewarding authors. These mandates leave courts with a delicate task:

> Drawing the line too liberally in favor of copyright protection would bestow strong monopolies over specific applications upon the first to write programs performing those applications and would thereby inhibit other creators from developing improved products. Drawing the line too conservatively would allow programmer's efforts to be copied easily, thus discouraging the creation of all but modest incremental advances.

Menell, *Scope of Copyright Protection for Programs,* 41 Stan.L.Rev. at 1047–48. *See also* Note, *Scope of Copyright Protection of Computer Program Structure,* 88 Mich. L.Rev. at 895; Note, *Defining the Scope of Copyright Protection for Computer Software,* 38 Stan.L.Rev. 497, 498 (1986).

Rather than itself drawing the boundary line between copyrightable and non-copyrightable elements of computer programs, Congress has mandated that courts use an evaluative standard in determining this boundary line—that is, a standard that distinguishes idea from expression and requires that a court, in applying this distinction, be sensitive to the object and policy of copyright law as manifested by Congress.

When statutes establish evaluative standards for deciding cases, courts—by necessity—must locate boundaries in un-

chartered terrain, using the markers that Congress has placed. At some places a boundary may run straight as a surveyor's sight-line between markers; at others, it may meander like a stream, moving toward resolution of clashing objects and policies the markers identify. No marker Congress has placed may be disregarded or relocated by courts. Even in those instances where text and context make clear that literal description of a marker is contrary to manifested meaning (as where "not" must be inserted or deleted to make sense of the statutory language) what the court is doing is aptly described as "locating," not "relocating," the marker Congress mandated. The fewer the markers Congress has placed, the more critical it becomes that courts assure that no marker escapes notice.

### B. The Idea–Expression and Useful–Expressive Distinctions

Although the statutory mandates are ambiguous in some critical respects, one point on which they are clear (one marker of the boundary line) is this: at least some, but clearly not all, aspects of computer programs, if original, are "works of authorship" in which copyright can subsist. 17 U.S.C. § 102(a)(1); House Report at 54, reprinted at 5667; CONTU, *Final Report* at 21. How can a court determine which aspects are copyrightable?

▮ The interplay between sections 102(a) and 102(b), illumined by the related legislative history, manifests that the statute extends copyright protection to expressive elements of computer programs, but not to the ideas, processes, and methods embodied in computer programs. House Report at 54, 57, *reprinted at* 5667, 5670. This dichotomy—which is often referred to as the "idea-expression distinction," and which embraces also the process-expression, method-expression, and useful-expressive distinctions, *see* Note, *Determining the Scope of Copyright Protection of Computer Program Structure,* 88 Mich.L. Rev. at 866–67—has long been a fundamental part of our copyright law. *Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1879).

In that seminal case, the Court held that the text of a book describing a special method of double-entry accounting on paper spreadsheets—the now almost universal T-accounts system—was copyrightable *expression*, but that the method itself, which embodied the *idea* of this particular kind of double-entry bookkeeping, was not. The Court thus concluded that Baker did not infringe Selden's copyright when Baker wrote his own treatise, in his own words, describing the special double-entry method of bookkeeping.

CONTU, too, concluded that the idea-expression distinction should be used to determine which aspects of computer programs are copyrightable. CONTU, *Final Report* at 37–46. The Commission recognized, though, that "[i]t is difficult, either as a matter of legal interpretation or technological determination, to draw the line between the copyrightable element of style and expression in a computer program and the process which underlies it." *Id.* at 44.

CONTU, of course, was not an official voice of Congress, and its views are not, without more, attributable to Congress. Thus, courts must not treat the CONTU report as legislative history, in the ordinary sense, much less as an authoritative statement about manifested legislative intent. *Whelan,* 797 F.2d at 1241–42. The privately held views of Vice–Chairperson Nimmer and Commissioner Miller, and especially the privately held views of Executive Director Levine, *see* declarations in *Evergreen Consulting*, without some manifestation of congressional endorsement, are even less relevant to the determination of manifested congressional intent. *Id.* at 1241 n. 37.

Congress, however, did not ignore CONTU. Indeed, as already noted, Congress adopted practically verbatim the Commission's proposed statutory changes with respect to computer programs. Thus, the expressed views of the Commission, to the extent not repudiated by Congress, may help to explain the context in which Congress acted, which in turn may support inferences about the meaning of any other-

wise ambiguous passages in what Congress declared.

I conclude that, with the Copyright Act of 1976 and the 1980 amendments to that Act, Congress manifested an intention to use the idea-expression distinction as part of the test of copyrightability for computer programs. That is, rather than adopting some other test of copyrightability that made the idea-expression dichotomy irrelevant (such as defendants' proposed literal-nonliteral distinction), Congress chose to extend copyright protection to original expression embodied in computer programs, but not to any idea, method, or process described by that expression. 17 U.S.C. §§ 102(a), 102(b); House Report at 54, 57, *reprinted at* 5667, 5670.

That conclusion is consistent with the treatment of other kinds of intellectual works—specifically, with the treatment of nonliteral elements of expression in musical, dramatic, and motion picture works, and works of literature. It is also consistent with the treatment of useful articles. That is, as explained more fully in Part IV(A), *infra,* I conclude that the user interface and some other nonliteral aspects of computer programs are *not merely* articles "having an intrinsic utilitarian function." 17 U.S.C. § 101 (defining "useful article"). When computer programs include elements—both literal and nonliteral—"that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article," *id.* (defining "pictorial, graphic, and sculptural works"), they are potentially copyrightable.

Finally, this conclusion is also consistent with the objects and policies of copyright— to encourage the creation and dissemination of new *ideas* by protecting, for limited times, the specific way that an author has *expressed* those ideas.

## IV. THE LEGAL TEST FOR COPYRIGHTABILITY APPLICABLE TO THIS CASE

*A. Functionality, Useful Articles, and the Useful–Expressive Distinction*

Defendants suggest that the user interface of Lotus 1–2–3 is a useful, "func-

tion[al]" object like the functional layout of gears in an "H" pattern on a standard transmission, the functional assignment of letters to keys on a standard QWERTY keyboard, and the functional configuration of controls on a musical instrument (*e.g.*, keys of a piano). Lewis Affdvt. ¶¶ 52–54. These "functional" "useful articles," defendants contend, are not entitled to copyright protection.

A similar analogy was made in *Synercom* where the court concluded that a sequence of data inputs for a statistical analysis program was like the "figure–H" pattern of a standard transmission. 462 F.Supp. at 1013. *Synercom*, though, was published less than a month after the publication of the CONTU report (which it never cites) and well before the 1980 amendments. Since then, congressional and judicial development of the law of copyrightability of computer programs has advanced considerably, and *Synercom's* central proposition—that the expression of nonliteral sequence and order is inseparable from the idea and accordingly is not copyrightable—has been explicitly rejected by several courts. *E.g., Whelan,* 797 F.2d at 1240, 1248 ("copyright protection of computer programs may extend beyond the programs' literal code to their structure, sequence, and organization"); *Broderbund Software, Inc. v. Unison World, Inc.,* 648 F.Supp. 1127, 1133 (N.D.Cal.1986) ("copyright protection is not limited to the literal aspects of a computer program, but rather ... it extends to the overall structure of a program, including its audiovisual displays"). Moreover, even those courts that have not gone as far as *Whelan* and *Broderbund* have still gone much farther in protecting computer programs than *Synercom. E.g., SAS Institute, Inc. v. S & H Computer Systems, Inc.,* 605 F.Supp. 816, 830 (M.D.Tenn.1985) ("copying of the organization and structural details" can form basis for infringement); *Manufacturers Technologies, Inc. v. CAMS, Inc.,* 706 F.Supp. 984, 993 (D.Conn.1989) ("screen displays or user interface" copyrightable); *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.,* 886 F.2d 1173, 1175 (9th Cir.1989) (nonliteral aspects such as "struc-

ture, sequence and/or organization of the program, the user interface, and the function, or purpose, of the program," are copyrightable to the extent that they embody expression rather than idea); *Telemarketing Resources v. Symantec Corp.,* 12 U.S. P.Q.2d 1991, 1993, 1989 WL 200350 (N.D. Cal.1989) (holding that "[c]opyright protection applies to the user interface, or overall structure and organization of a computer program, including its audiovisual displays, or screen 'look and feel,'" but finding no infringement in this case); *Q–Co. Industries v. Hoffman,* 625 F.Supp. 608, 615–16 (S.D.N.Y.1985) (similarity of "structure and arrangement" can form basis of infringement suit, but here, structural similarities were dictated by functional considerations and hence were non-copyrightable ideas rather than copyrightable expression); *Pearl Systems, Inc. v. Competition Electronics, Inc.,* 8 U.S.P.Q.2d 1520, 1524, 1988 WL 146047 (S.D.Fla.1988) ("Copyright protection of computer software is not limited to the text of the source or object code"). *But see Softklone,* 659 F.Supp. at 455, 465 (rejecting *Broderbund's* conclusion that audiovisual screen displays are copyrightable, although holding that separate copyright on status screen display was infringed where "total concept and feel" was copied); *Plains Cotton Cooperative Association v. Goodpasture Computer Service, Inc.,* 807 F.2d 1256, 1262 (rejecting *Whelan's* protection for structure, sequence, and organization, court instead held that sequence and organization, where dictated by market forces, is non-copyrightable idea rather than copyrightable expression), *reh'g denied,* 813 F.2d 407 (5th Cir.), *cert. denied,* 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987). In any event, *Synercom's* input formats are quite different from, and distinguishable from, the nonliteral aspects of 1–2–3 at issue in this case.

Defendant's proposed analogy is also similar to the analogy drawn by Commissioner Hersey between a computer program and an object that is designated to do work—for example, the cam of a drill. CONTU, *Final Report* at 58–60 (Hersey, C., dissenting). His view, however, was in

dissent, and not a view advanced by CON-TU. Because Congress adopted CONTU's recommendations practically verbatim, it is reasonable to infer that Congress did not adopt Commissioner Hersey's view.

Moreover, I conclude that defendants' contentions, to the extent they are similar to *Synercom's* central proposition and to Commissioner Hersey's views in dissent, are inconsistent with the legislative history and statutory mandates explained above. If, in a context such as that of *Synercom* or of this case, an idea and its expression were taken to be inseparable and the expression therefore not copyrightable, copyright law never would, as a practical matter, provide computer programs with protection as substantial as Congress has mandated—protection designed to extend to original elements of expression however embodied. I credit the testimony of expert witnesses that the bulk of the creative work is in the conceptualization of a computer program and its user interface, rather than in its encoding, and that creating a suitable user interface is a more difficult intellectual task, requiring greater creativity, originality, and insight, than converting the user interface design into instructions to the machine. *See* Galler Decl. ¶¶ 37, 39; Emery Decl. ¶¶ 22, 25–28 (Docket No. 265); Reed Decl. ¶¶ 26–27 (Docket No. 290). Defendants' contentions would attribute to the statute a purpose to protect only a narrowly defined segment of the creative development of computer programs, and to preclude from protection even more significant creative elements of the process. Such a result is fundamentally inconsistent with the statutory mandates.

Also, defendants' contention would have the additional consequence that computer programmers would have little, if any, more protection for nonliteral elements of expression embodied in their original works of authorship than is already provided by trade secret law. If the intellectual effort and creativity embodied in a user interface were protectable only by trade secret law, the length of protection for computer programs would be very short—merely the time it takes to examine a program and then duplicate the nonliteral elements in a newly written computer program. This short period of protection is fundamentally inconsistent with the mandates of the copyright law.

Defendants have advanced their "useful article" (or "functionality") argument in many forms. Never, however, have they stated every premise that is a step of the reasoning implicit in the argument. One set of unstated premises is the assumed meanings of "useful," "article," and "useful article." Indeed, different forms of their argument have depended on different assumed meanings for one or more of these three terms. Some illustrations will clarify this point.

Suppose, first, the form of the argument is this:

A "useful article" is not copyrightable; a "computer program" is an "article," and a good "computer program" is "useful"; therefore, a good "computer program" is not copyrightable.

In this illustration, "useful," "article," and "useful article" are assumed to have meanings consistent with ordinary usage (with an exception to be noted below). The proposition that emerges when the words are interpreted in this way is, of course, plainly contrary to congressional mandates. Congress must have had some purpose in defining "computer program" and declaring that an "owner of a copy of a computer program" may make additional copies, in specified circumstances, without violating copyright laws. 17 U.S.C. §§ 101, 117. The clear implication of the 1980 amendments is that in some circumstances, at least, a good computer program *is* copyrightable. Otherwise, there would have been no need for Congress to enact these two provisions about a "computer program" and additional "copies."

It follows that, for this defense argument to make any sense and also be consistent with congressional mandates, defendants must be proposing that "useful", or "article," or "useful article," or all three, be interpreted in some sense different from their ordinary meanings. In what sense, though, they never say.

Suppose, second, a different form of the argument:

A "useful article" is not copyrightable; a "screen display" is an "article," and a good "screen display" is "useful"; therefore, a good "screen display" is not copyrightable.

Here, the implicit meaning of "article" is being stretched beyond ordinary usage to apply to what one would ordinarily think of as just one part of an article, rather than itself an article. Also, the implicit meaning of "article" stretches beyond what one would ordinarily think of as something that, as part of a larger "article," is itself an "article." Thus, the implicit meaning of "article" is broader still than the statutory mandate that "[a]n *article* that is normally a part of a useful article is considered a 'useful article.'" 17 U.S.C. § 101 (emphasis added). Are these expansions of the meaning of "article" consistent with the text and with the object and policy manifested in the statute? We may be better prepared to answer after considering one more illustrative form of the argument.

Suppose, third, this form of the argument:

A "useful article" is not copyrightable; a "user interface" is an "article," and a good "user interface" is "useful"; therefore, a good "user interface" is not copyrightable.

Here, the meaning of "article" is plainly stretched beyond ordinary usage, and especially when we understand "user interface" in a sense broad enough to include nonliteral elements such as the command structure. Moreover, unease that we are being led into a departure from statutory text and manifested object and policy grows deeper as we reflect still more on this illustrative form of the argument.

One problem is that the argument depends on changing the assumed meaning of one or all of "useful," "article," and "useful article," to suit the needs of the copier who is advancing the argument as a defense against a claim of copyright infringement.

An even deeper fallacy of the argument, however, is that it assumes a meaning of "useful article" in step one ("a 'useful article' is not copyrightable") that goes far beyond ordinary meanings of "useful" and "article" combined. That is, not merely does it assume a *descriptive* meaning of something that is an "article" and is also "useful," but in addition it assumes that the definition of "useful article" includes, as something built into it, a rule of law: Everything that is a "useful article" in a descriptive sense is also, by rule of law, not copyrightable, and under this rule of law, nothing about a "useful article"—no element, no aspect, no part of it—can ever be copyrighted. Merely to expose this assumed prescriptive meaning of "useful article," as defendants persistently use the phrase, is to demonstrate that any argument founded upon this meaning is fundamentally inconsistent with the mandates of the copyright statute.

It may be quite true, with respect to "useful articles"—indeed I believe it to be so—that their utilitarian aspects are not copyrightable, and that things that *merely* utter work, such as the cam of a drill, are not copyrightable. It is not true, however, that every aspect of a user interface that is "useful" is therefore not copyrightable. For example, Lotus 1–2–3 is surely "useful." It does not follow that when an intellectual work achieves the feat of being useful as well as expressive and original, the moment of creative triumph is also a moment of devastating financial loss—because the triumph destroys copyrightability of all expressive elements that would have been protected if only they had not contributed so much to the public interest by helping to make some article useful.

Defendants' contention misses this point by proceeding on an erroneous assumption about the role of "functionality" in copyright law. It is true that "functionality" of an article does not itself support copyrightability. Thus, it never strengthens a claim for copyright to show that the "work" for which copyright protection is claimed is useful. A congressional mandate that "proof that an intellectual work is a 'useful article' does not support the author's claim for copyright" is not, however, a mandate

that "if one who copied the author's work proves that the work was 'useful' or 'functional,' the author loses *all* copyright protection." Transforming a mandate that "proof of usefulness *does not strengthen* a copyright claim" to a mandate that "proof of usefulness *destroys* a copyright claim" is, to say the least, a remarkable intellectual leap. Defendants have not advanced such a proposition explicitly. But this is in fact an implicit premise of their contention—or a consequence of it, if one takes a hindsight view of having applied their proposed rule in decisionmaking. In effect, their proposed rule would work this way: Anything that is useful is a "useful article"; nothing about a "useful article" is ever copyrightable; because 1–2–3 is useful, and is an article, it is not copyrightable.

A more sensible interpretation of the statutory mandate is that the mere fact that an intellectual work is useful or functional—be it a dictionary, directory, map, book of meaningless code words, or computer program—does not mean that none of the elements of the work can be copyrightable. Also, the statute does not bar copyrightability merely because the originality of the expression becomes associated, in the marketplace, with usefulness of the work to a degree and in dimensions not previously achieved by other products on the market. *Brandir International, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142, 1147 (2d Cir.1987) ("[A] copyrighted work ... does not lose its protected status merely because it subsequently is put to functional use."); *NEC Corp. v. Intel Corp.*, 645 F.Supp. 590, 595 (N.D.Cal. 1986) ("function performed by defendant's microprograms ... does not affect their status as copyrightable subject matter), *vacated on grounds of judge's recusal, see* 835 F.2d 1546 (9th Cir.1988). To hold otherwise would be to deny copyright protection to the most original and least obvious products of the creative mind merely because the marketplace accepts them as distinctively "functional." Such a rule would grant copyright protection for only those products that fall far short of being the best available. Rather than promoting and encouraging both the development and disclosure of the best, such a rule would offer incentives to market only the second, or third, or tenth best, and hold back the best for fear that it is too good for copyrightability. Copyrightability is not a synonym for imperfection.

Accordingly, I conclude that a court, in determining whether a particular element is copyrightable, must not allow one statutory mandate—that functionality or usefulness is not itself a basis for copyrightability—to absorb and destroy another statutory mandate—that elements of expression are copyrightable. Elements of expression, even if embodied in useful articles, are copyrightable if capable of identification and recognition independently of the functional ideas that make the article useful. This mandate may be viewed as a corollary of the central distinction of copyright law between idea and expression, which is explored further immediately below.

## B. The Idea–Expression Riddle: Four Additional Concepts

It is by now plain that an idea is not copyrightable and an expression may be. It does not follow, though, that every expression of an idea is copyrightable. To begin to get an understanding of the legally significant contrasts among an idea, noncopyrightable expressions of the idea, and a copyrightable expression, we must take account of four more concepts.

Earlier parts of this Opinion refer to two of these four—"originality" and "functionality." The expression of an idea is copyrightable only if it is original—that is, if the expression originated with the author. 17 U.S.C. § 102(a); *see* Part III(A)(2)(b), *supra*. Even then the expression of the idea is not copyrightable if the expression does no more than embody elements of the idea that are functional in the utilitarian sense. 17 U.S.C. § 102(b); *see* Part IV(A) *supra*.

The third concept is "obviousness." When a particular expression goes no farther than the obvious, it is inseparable

from the idea itself. Protecting an expression of this limited kind would effectively amount to protection of the idea, a result inconsistent with the plain meaning of the statute. *E.H. Tate Co. v. Jiffy Enterprises, Inc.*, 16 F.R.D. 571, 573 (E.D.Pa.1954) (small sketch and accompanying instruction "Apply hook to wall" so obvious that it is not entitled to copyright protection).

 It is only a slight extension of the idea of "obviousness"—and one supported by precedent—to reach the fourth concept: "merger." If a particular expression is one of a quite limited number of the possible ways of expressing an idea, then, under this fourth concept, the expression is not copyrightable:

> When the uncopyrightable subject matter is very narrow, so that "the topic necessarily requires," if not only one form of expression, at best only a limited number, to permit copyrighting would mean that a party or parties, by copyrighting a mere handful of forms, could exhaust all possibility of future use of the substance. In such circumstances it does not seem accurate to say that any particular form of expression comes from the subject matter. However, it is necessary to say that the subject matter would be appropriated by permitting the copyrighting of its expression. We cannot recognize copyright as a game of chess in which the public can be checkmated.

*Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678–79 (1st Cir.1967) (citations omitted). *See also Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 606 (1st Cir.1988) ("When there is essentially only one way to express an idea, the idea and its expression are inseparable and copyright is no bar to copying that expression."); *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir.1971) (idea of a jewel-encrusted life-like bee pin inseparable from expression; thus expression not copyrightable because "protecting the 'expression' in such circumstances would confer a monopoly of the 'idea' upon the copyright owner"). *Cf. Atari, Inc. v. North American Philips*

*Consumer Electronics Corp.*, 672 F.2d 607, 616 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982) (*scènes à faire* of literary works—"stock literary devices" such as "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic"—"are not protectible [sic] by copyright"); *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 489 (9th Cir.) (*scènes à faire* not copyrightable because granting a copyright "would give the first author a monopoly on the commonplace ideas behind the *scènes à faire* "), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984).

 If, however, the expression of an idea has elements that go beyond all functional elements of the idea itself, and beyond the obvious, and if there are numerous other ways of expressing the non-copyrightable idea, then those elements of expression, if original and substantial, are copyrightable.

## C. Elements of the Legal Test for Copyrightability

A "legal test," as I use the phrase here, is a statement of the elements of fact, or law, or both fact and law, that must be addressed by a decisionmaker to decide a question potentially decisive of some claim or defense. "Copyrightability" of nonliteral elements of Lotus 1–2–3 is essential to the claim of the plaintiff in this case.

As already noted, the legal test for deciding copyrightability, in a factual context such as is presented here, has not been precisely defined either in the copyright statute or in precedents interpreting and applying it. Nevertheless, the statute and the precedents contain many mandates— "markers" of the borderline between copyrightability and non-copyrightability—that narrow the scope of the questions remaining to be answered to determine what test to apply.

Drawing into one statement the fundamental truths about ideas and their expression that were sketched above, one may accurately say that the issue of copyrightability of a "work" turns not on whether

the work expresses ideas but instead on whether, in addition to expressing one or more ideas, in some material respect it does more, and in an original way. One need not totally disentangle the idea. from its expression in order to conclude that a particular ·aspect is expression. Indeed, to speak as if it were ever possible completely to disentangle an idea from an expression of that idea is to speak abstract fiction rather than real-life fact. Disentanglement, then, is not an "either-or," "0–1," "negative-positive," or "binary" matter. It is, instead, a matter of degree.

Still, even if the "idea" cannot be completely disentangled from its expression, to determine what is copyrightable a decisionmaker must understand the meaning of "idea" within the idea-expression distinction. To do so one must take note also of another distinction—one between generality and specificity of conceptualizing the idea. Thus, a statement of the most significant elements of the legal test for copyrightability, consistent with precedents, begins:

> FIRST, in making the determination of "copyrightability," the decisionmaker must focus upon alternatives that counsel may suggest, or the court may conceive, *along the scale from the most generalized conception to the most particularized,* and choose some formulation—some conception or definition of the "idea"—for the purpose of distinguishing between the idea and its expression.

As Learned Hand recognized in a 1930 case concerning the alleged infringement of the copyright of a play:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the

use of his "ideas," to which, apart from their expression, his property is never extended. Nobody has ever been able to fix that ·boundary, and nobody ever can. *Nichols,* .45 F.2d at 121 (citations omitted). *See also Shipman v. R.K.O. Radio Pictures,* 100 F.2d 533, 538 (2d Cir.1938) (L. Hand, J., concurring) ("*Nichols* ... held that there is a point where the similarities are so little concrete (and therefore so abstract) that they become only 'theme', 'idea', or skeleton of the plot, and that these are always in the public domain; no copyright can protect them. The test is necessarily vague and nothing more definite can be said about it.") Thirty more years of experience in judging did not change Learned Hand's view: "Obviously, no principle can be stated as to when an imitator has gone beyond copying ·the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be ad hoc." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand, J.). In another context, Hand described such "ad hoc" decisionmaking as "fiat." *Sinram v. Pennsylvania Railroad Co.,* 61 F.2d 767, 771 (2d Cir. 1932) (L. Hand, J.). In whatever way this kind of decisionmaking may be described, Hand offered us no formula for distinguishing between idea and expression like that he devised for the calculus of reasonable care in *United States v. Carroll Towing Co.,* 159 F.2d 169, 173 (L. Hand, J.) (articulating the "BPL" formula), *reh'g denied,* 160 F.2d 482 (2d Cir.1947). It seems the better part of wisdom, if not valor, not to press the search for a suitable bright-line test of copyrightability where Learned Hand, even after decades of experience in judging, found none.

For all these reasons, as a practical necessity, whether explicitly or only implicitly, courts apply an abstractions scale in determining copyrightability. In doing so they make a decision involving choice and judgment of a type that human minds make regularly in daily affairs, but computers of the current state of the art cannot make.[2] Still, though "judgment" is

---

**2.** Despite *Time* Magazine's decision to honor "the computer" as its 1982 "Man of the Year,"

required and the answer to be given is not precisely "calculable," analogies to arithmetic calculations and to "scales of justice" may aid the human mind in choosing and "weighing" factors that properly go into the metaphoric calculus.

In summary, one among the principal elements to be weighed in determining copyrightability when the idea-expression distinction applies is to conceive and define the idea in a way that places it somewhere along the scale of abstraction (somewhere between the most abstract and the most specific of all possible conceptions). Illustrations from the evidence in this case will help to explain in a more concrete way this element of the legal test for copyrightability. *See* Part V(C), *infra.* Before turning to those illustrations, however, I state in a similarly abstract way, to be explained later by illustrations, two more elements that I conclude a decisionmaker must consider to determine copyrightability of a computer program like that at issue in this case.

In addition to taking account of the distinction between generality and specificity, to make use of Hand's abstraction scale for applying the idea-expression distinction we need to identify and distinguish between essential and nonessential details of expressing the idea. Some, but of course not all, details, are so essential that their omission would result in a failure to express *that* idea, or in the expression of only a different and *more general* idea. Accordingly, two more elements in the legal test for copyrightability are:

SECOND, the decisionmaker must focus upon whether an alleged expression of the idea is limited to elements essential to expression of *that* idea (or is one of only a few ways of expressing the idea) or instead includes identifiable elements of expression not essential to every expression of that idea.

THIRD, having identified elements of expression not essential to every expression of the idea, the decisionmaker must focus on whether those elements are a substantial part of the allegedly copyrightable "work."

In addressing this third element of the test for copyrightability, the decisionmaker is measuring "substantiality" not merely on a quantum scale but by a test that is qualitative as well. *SAS Institute*, 605 F.Supp. at 829–30 ("the piracy of even a quantitatively small fragment ('a rose by any other name would smell as sweet') may be qualitatively substantial").

By its nature, a legal test that requires weighing of factors or elements such as these is not a bright-line or an either-or test. It requires of the decisionmaker, instead, an evaluative or "judgmental" weighing of all relevant characteristics of the work in which a copyright is claimed, all relevant characteristics of the allegedly infringing work, and all of the relevant circumstances of their development and use. It requires, also, not a step-by-step decisionmaking process, but a simultaneous weighing of all the factors or elements that the legal test identifies as relevant. I do not suggest that the three elements identified here are an all-inclusive list. They do appear, however, to be the principal factors relevant to decision of copyrightability of a computer program such as Lotus 1–2–3.

If the decisionmaker, weighing the relevant factors, determines that the legal test applying the idea-expression distinction is satisfied, copyrightability is established. Issues may remain, of course, as to whether a copyright was perfected and whether the alleged infringing work, measured by the "substantial similarity" test, did contain elements that infringed upon the copyrightable elements of the copyrighted "work." Also, issues may remain as to whether damages have been proved, or whether the controversy over infringement is instead " 'a trivial pother,' a mere point of honor, of scarcely more than irritation, involving no substantial interest," *Fred Fisher, Inc. v. Dillingham*, 298 F. 145, 152 (S.D.N.Y.1924) (L. Hand, J.) (citations omit-

and despite advances in the field of artificial intelligence, I take it as a premise of decisionmaking in this case that computers, for better or worse, do not yet have the human feelings, strengths, and failings that lie beyond those we describe as logical, or cognitive, or intellectual in the broadest sense.

ted), for which only statutory damages should be awarded. 17 U.S.C. § 504(c) (1988).

### D. Incentives and the Role of Advocacy

The advocate of broad copyrightability who understands that the court will apply a legal test that focuses principally on these three elements has an incentive to urge that the court conceive the "idea" in a very generalized sense; then many different expressions of the idea would be possible, and protection might be claimed for the work. The advocate of freedom to copy—and of narrow copyrightability—has an incentive to urge that the court conceive the "idea" in a very particularized sense; then only one or a few expressions of an idea defined in such particularized terms would be possible, and no copyright protection for those few expressions would be available because the idea and expression would merge completely, or nearly so. Such extreme positions would fail to assist the court in determining, for purposes of the first element, where properly to place the idea along the abstractions scale.

There is risk for each advocate, however, in yielding too readily to these respective incentives. The argument of an advocate who presses too far in one or the other of these directions of generality or specificity in defining the idea will not only lose the argument advanced but also lose credibility for later advancing a more sensible alternative that proposes a less extreme but still favorable position along the scale. Upon reflection, then, advocates on both sides will be—or at least should be—encouraged to moderate their ultra-contentious and extreme positions in favor of more supportable propositions that will more sharply focus the issue for adjudication.

There is an additional risk for the advocate of freedom to copy who attempts to persuade the court that Hand's abstractions scale, and the three-element test applying it, is irrelevant to computer programs. That advocate will be tempted to define the idea in the most generalized terms, hoping to persuade the court that, because the abstractions scale does not ap-

ply, all of the many different expressions of that idea are non-copyrightable and everyone is free to copy.

In this case, defendants have in fact advanced such an argument. Yielding only to the near-uniformity of precedent for copyrightability of source code and object code, defendants have argued that every other form of expression of the "spreadsheet metaphor" is non-copyrightable. For reasons now to be explained, neither this extreme contention nor any of the alternatives the defendants have advanced for non-copyrightability can be sustained.

### V. APPLICATION OF THE LEGAL TEST TO LOTUS 1–2–3

### A. "Look and Feel"

In musical, dramatic, and motion picture works, and works of literature, nonliteral elements that are copyrightable have sometimes been described as the "total concept and feel" of a work, *Roth Greeting Cards*, 429 F.2d at 1110; *Krofft Television*, 562 F.2d at 1167, "the fundamental essence or structure" of a work, 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.03[A][1] (1989), or "the 'pattern' of the work," Chaffee, *Reflections on the Law of Copyright: Part I*, 45 Colum.L.Rev. 503, 513 (1945). In the context of computer programs, nonliteral elements have often been referred to as the "look and feel" of a program, *e.g.*, *Telemarketing Resources*, 12 U.S.P.Q.2d at 1993; Samuelson and Glushko, *Comparing the Views of Lawyers and User Interface Designers on the Software Copyright "Look and Feel" Lawsuits*, 30 Jurimetrics 121 (1989). Initially, plaintiff too referred to these elements as "look and feel," Amended Complaint ¶ 13 (Docket No. 15), though plaintiff—in trial, at least—has not rested its contentions primarily on this terminology.

Despite its widespread use in public discourse on the copyrightability of nonliteral elements of computer programs, I have not found the "look and feel" concept, standing alone, to be significantly helpful in distinguishing between nonliteral elements of a computer program that are copyrightable and those that are not.

One may argue that the phrase "look and feel" is analogous to the "total concept and feel" test developed in *Roth Greeting Cards*, 429 F.2d at 1110, and used in *Krofft Television*, 562 F.2d at 1167. In these cases, however, the "total concept and feel" test was not invoked—at least, not explicitly—as an aid to the court in determining which nonliteral elements were copyrightable and why. Rather, these courts used the concept, not in determining copyrightability, but, apparently assuming copyrightability, in applying the substantial similarity test to determine whether forbidden copying had occurred. For example, in *Roth Greeting Cards*, the court considered whether the "text, arrangement of text, art work, and association between art work and text" of defendant's greeting cards were substantially similar to (*e.g.*, copied the "total concept and feel" of) those elements of plaintiff's greeting cards. 429 F.2d at 1109. And in *Krofft Television*, the inquiry focused on whether defendant McDonald's, with its television commercials, copied the "total concept and feel" of plaintiff's H.R. Pufnstuf children's television series by copying its locale (both occurred in imaginary world with similar trees, caves, a pond, a road and a castle), fictional characters (both were inhabited by talking trees, mayors with disproportionately large round heads and long wide mouths, "Keystone cops" characters, crazy scientists, and a multi-armed evil creature), costumes and sets (created for defendant by former employees of plaintiff), voices (executed for defendant by same voice expert who did the voices for plaintiff's television series), and plot. 562 F.2d at 1161, 1167 n. 9.

It may be true that the issues of copyrightability and substantial similarity are so interrelated that these precedents are relevant. The fact remains that they are not directly in point for determining copyrightability in this case. Moreover, "look and feel" is a conclusion, and the usefulness and applicability of a precedent depends on the *reasons* the conclusion was reached in a particular context, not on the *conclusion* itself. Thus, in trying to understand the relevance of "concept and feel" precedents, we need to look to details of those cases that appear to have been relied upon in reaching the conclusion, rather than merely embracing the conclusion without regard for underlying reasons. As we probe the circumstances of these precedents that closely, we are likely to do something akin to applying the three-element test described above.

### B. The User Interface

Plaintiff in the present case, not now pressing any argument that the phrase "look and feel" is a satisfactory description of the copyrightable elements of Lotus 1-2-3, suggests that the copyrightable nonliteral elements are more appropriately described by the phrase "user interface." According to plaintiff, the "user interface" of 1-2-3 includes such elements as "the menus (and their structure and organization), the long prompts, the screens on which they appear, the function key assignments, [and] the macro commands and language," Plaintiff's Post-Trial Brief at 53 (Docket No. 319). I turn now to examining these elements more closely.

Like manual spreadsheets, *Baker*, 101 U.S. at 100, the electronic spreadsheet presents a blank form on which numerical, statistical, financial or other data can be assimilated, organized, manipulated and calculated. Galler Decl. ¶¶ 101–103; Lewis Affdvt. ¶ 92. In both Lotus 1-2-3 and VP-Planner, as in many other electronic spreadsheet programs, a highlighted element of the basic screen display resembles an "L" rotated ninety degrees clockwise with letters across the top to designate columns, and numbers down the left side to designate rows. *See* Appendices 1 (VisiCalc), 2 (1-2-3), and 3 (VP-Planner). *Cf.* Multiplan, which also has a rotated "L" screen display, but which uses numbers for both columns and rows (Tr. Ex. (Trial Exhibit) 132). The intersection of each column and row is a "cell" in which a value (*e.g.*, 31,963), formula (*e.g.*, one that adds a column of numbers), or label (*e.g.*, "Cost of Goods") may be entered.

Both programs utilize a "two-line moving-cursor menu," which presents the user

with a list of command choices (*e.g.*, "file", "copy", "quit") and a moving cursor to use in communicating ("entering") the choice. The menu is called up to the screen by pressing the slash ("/") key, and is located either above the rotated "L" (as in 1–2–3, *see* Appendix 2) or below the rotated "L" (as in VP–Planner, *see* Appendix 3). *Cf.* Multiplan, which uses a three-line moving cursor menu (Tr. Ex. 132); Excel, which has "pull-down" bar menus (Tr. Ex. 79).

The top line of the two-line menu contains a series of words, each of which represents a different command. For example, the top line of the first, or main, menu in 1–2–3 reads: "Worksheet Range Copy Move File Graph Data Quit". *See* Appendix 2; *cf.* Appendix 3 (main menu in VP–Planner). The first word of the line is highlighted to signify the command that will be chosen if the "enter" key is pressed; the highlighting, or "cursor," moves to the right or left if the right or left cursor key is pressed.

The second line of the menu displays a "long prompt," which contains further information about the highlighted command. In some cases, the long prompt is a description of the highlighted command (*e.g.*, for command "Copy", the long prompt reads: "Copy a cell or range of cells"); in other cases, the long prompt provides a list of the menu command subchoices that will be available if the highlighted command is chosen (*e.g.*, for command "Worksheet", the long prompt reads: "Global, Insert, Delete, Column–Width, Erase, Titles, Window, Status"; *see* Appendix 2; *cf.* Appendix 3 (VP–Planner)). In the latter case, if the highlighted command is subsequently chosen, the words that appeared in the long prompt will now appear as second-level menu command choices on the top line of the menu, and a new long prompt will take its place on the second line.

In addition to having the option of selecting a command by moving the cursor to the command and pressing the "enter" key, a user may instead press the key representing the first letter of the command word (*e.g.*, "C" for "Copy", "W" for "Worksheet"). For this reason, each word represents each command on a given menu line must start with a different letter. *See* Galler Affdvt. ¶¶ 105–117; Lewis Decl. ¶¶ 96–97.

Function keys present an additional way for the user to communicate with, and operate, the programmed computer. Each program assigns certain frequently-used commands to the various "function keys" (labelled "F1", "F2", "F3", etc.) on the keyboard. For example, in 1–2–3, "F1" corresponds to the command "Help", and "F2" to the command "Edit". Galler Decl. ¶ 125. VP–Planner, in contrast, assigns the function keys to the commands on the top line of the menu. Thus, for example, when VP–Planner is in its main menu mode, "F1" corresponds to the command "Help", "F2" to the command "Worksheet", "F3" to the command "Range", "F4" to the command "Copy", and so on. *See* Appendix 3 (function key numbers listed before command terms).

Typically, users adapt particular spreadsheets to their specific needs. Suppose, for example, that in order to achieve a desired result, a user must perform the same sequence of commands repeatedly in order to cause the computer to execute the same functions repeatedly (*e.g.*, calculating depreciation based on certain financial data, or saving the spreadsheet and printing a copy of it). Rather than going step-by-step through the same sequence of commands each time there is a need to perform a particular function, the user may store a sequence of command terms as a "macroinstruction," commonly called a "macro," and then, with one command stroke that invokes the macro, cause the programmed computer to execute the entire sequence of commands.

In 1–2–3, the command terms within a macro may consist of menu choices (*e.g.*, "/C" to copy a cell or range of cells, or "/PPRA1.F19{enter}AGQ"—for the command sequence "Print, Printer, Range, Cell A1 to Cell F19, Align, Go, Quit"—to print the specified range of cells from the spreadsheet). Also a macro may include keyboard commands (such as function keys, cursor keys, or the "enter" key), and

special macro commands invoked by the command "/X" (*e.g.*, "/XI" is a macro command that performs an "if-then" logical function). Because macros may contain many menu choices, the exact hierarchy—or structure, sequence and organization—of the menu system is a fundamental part of the functionality of the macros. Also, because macro commands are typically invoked by entering the first letter of command choices (*e.g.*, "/C" for copying, "/PPRA1.F19{enter}AGQ" for printing the specified range of cells), the first letter of each command choice on a particular menu is a vital element of the functionality of macros. *See* Galler Decl. ¶¶ 121–124; Lewis Affdvt. ¶¶ 109–115.

## C. Elements of the User Interface as Expression

Applying to 1–2–3 the legal test stated in Part IV(C), *supra*, I consider first where along the scale of abstraction to conceive the "idea" for the purpose of distinguishing between the idea and its expression.

At the most general level of Hand's abstractions scale, *Nichols*, 45 F.2d at 121—the computer programs at issue in this case, and other computer programs that have been considered during the course of trial, are expressions of the idea of a computer program for an electronic spreadsheet. Defendants are quite correct, then, in asserting that the idea of developing an electronic spreadsheet is not copyrightable—that the core idea of such a spreadsheet is both functional and obvious, even to computer users who claim no technical competence. Thus, even though programs like VisiCalc, 1–2–3, Multiplan, SuperCalc4, and Excel are very different in their structure, appearance, and method of operation, each is, at the most basic level, just a different way of expressing the same idea: the electronic spreadsheet. It does not follow, however, that every possible method of designing a metaphorical spreadsheet is obvious, or that no form of expressing the idea of the spreadsheet metaphor can possibly have such originality in pressing beyond the obvious as is required for copyrightability, or that no special form of metaphorical spreadsheet can possibly

be a distinctive expression of a particular method of preparing financial information.

The idea for a two-line moving cursor menu is also functional and obvious, and, indeed, is used in a wide variety of computer programs including spreadsheet programs. Nevertheless, it does not follow that every possible method of designing a menu system that includes a two-line moving cursor is non-copyrightable.

Of course, if a particular expression of the idea of an electronic spreadsheet communicates no details beyond those essential to stating the idea itself, then that expression would not be copyrightable. The issue here is whether Lotus 1–2–3 does go beyond those details essential to any expression of the idea, and includes substantial elements of expression, distinctive and original, which are thus copyrightable.

The idea for an electronic spreadsheet was first rendered into commercial practice by Daniel Bricklin. As a student at Harvard Business School in the late 1970's, Bricklin envisioned a "magic blackboard" that would recalculate numbers automatically as changes were made in other parts of the spreadsheet. Eventually, aided by others, he transformed this idea into VisiCalc, the first commercial electronic spreadsheet. *See* Bricklin Affdvt. ¶¶ 48–96 (Docket No. 217). Bricklin's idea for Visi-Calc was a revolutionary advance in the field of computer programming. Dauphinais Affdvt. ¶ 98 (Docket No. 280).

Although VisiCalc was a commercial success, implementational characteristics limited the scope and duration of its marketability as a spreadsheet product. Most notably, VisiCalc was originally programmed for use on the Apple II computer, which had limited memory (32K of RAM), limited screen display capabilities (only 40 characters per line), and limited keys available on the keyboard (no function keys and no up and down cursor keys). When VisiCalc was later rewritten for use on the IBM PC (which was introduced in August 1981), it was transferred with minimal changes and without taking advantage of many of the PC's more extensive capabilities.

Mitchell Kapor and Jonathan Sachs, the original authors of 1–2–3, exploited this opportunity. Building on Bricklin's revolutionary idea for an electronic spreadsheet, Kapor and Sachs expressed that idea in a different, more powerful way. 1–2–3 took advantage of the IBM PC's more expansive memory and more versatile screen display capabilities and keyboard. 1–2–3, like many electronic spreadsheet programs since, could thus be thought of as an evolutionary product that was built upon the shoulders of VisiCalc.

Just as 1–2–3 expressed the idea of an electronic spreadsheet differently from VisiCalc, so did Microsoft's Excel. Originally written for the Apple Macintosh computer, it exploits the enhanced graphics capabilities of the Macintosh, as well as the mouse input device that is standard with the Macintosh. Excel has pull-down bar menus rather than a two-line moving-cursor menu, and a very different menu-command hierarchy. Tr. Ex. 79.

As already noted, these three products— VisiCalc, 1–2–3, and Excel—share the general idea of an electronic spreadsheet but have expressed the idea in substantially different ways. These products also share some elements, however, at a somewhat more detailed or specific point along the abstractions scale. One element shared by these and many other programs is the basic spreadsheet screen display that resembles a rotated "L." *See* Appendices 1 (VisiCalc), 2 (1–2–3), and 3 (VP–Planner). Although Excel uses a different basic spreadsheet screen display that more closely resembles a paper spreadsheet, there is a rather low limit, as a factual matter, on the number of ways of making a computer screen resemble a spreadsheet. Accordingly, this aspect of electronic spreadsheet computer programs, if not present in every expression of such a program, is present in most expressions. Thus the second element of the legal test weighs heavily against treating the rotated "L" screen display as a copyrightable element of a computer program. *Morrissey*, 379 F.2d at 678–79.

Another expressive element that merges with the idea of an electronic spreadsheet— that is, that is an essential detail present in most if not all expressions of an electronic spreadsheet—is the designation of a particular key that, when pressed, will invoke the menu command system. The number of keys available for this designation is limited for two reasons. First, because most of the keys on the keyboard relate either to values (*e.g.,* the number keys and mathematical operation keys) or labels (*e.g.,* the letter keys), only a few keys are left that can be used, as a practical matter, to invoke the menu command system. Without something more, the programmed computer would interpret the activation of one of these keys as an attempt by the user to enter a value or label into a cell. Second, because users need to invoke the command system frequently, the key designated for this purpose must be easily accessible. For example, the user should not be required to press two keys at the same time (such as "Shift," "Alt," or "Ctrl" along with another key).

As just noted, when all the letter, number, and arithmetic keys are eliminated from consideration, the number of keys remaining that could be used to invoke the menu command system is quite limited. They include the slash key ("/") and the semi-colon key (";"). The choice of the creators of VisiCalc to designate the slash ("/") key to invoke the menu command system is not surprising. It is one of very few practical options. Thus the second element of the legal test weighs heavily against copyrightability of this aspect of VisiCalc—and of 1–2–3. This expression merges with the idea of having a readily available method of invoking the menu command system.

Other elements of expression a decision-maker may regard as either essential to every expression of an electronic spreadsheet, or at least "obvious" if not essential, include the use of the "+" key to indicate addition, the "−" key to indicate subtraction, the "*" key to indicate multiplication, the "/" key within formulas to indicate division, and the "enter" key to place keys-

troke entries into the cells. *See* Dauphinais Affidavit, ¶ 78.

Each of the elements just described is present in, if not all, at least most expressions of an electronic spreadsheet computer program. Other aspects of these programs, however, need not be present in every expression of an electronic spreadsheet. An example of distinctive details of expression is the precise "structure, sequence, and organization," *Whelan,* 797 F.2d at 1248, of the menu command system.

Consider first the menu command system of VisiCalc. The main menu command line reads: "Command: BCDEFGIMPRSTVW–". *See* Appendix 1. Each of these letters (or, to use defendants' experts' preferred terminology, "symbolic tokens") stands for a different command—in this case: Blank, Clear, Delete, Edit, Format, Global, Insert, Move, Print, Replicate, Storage, Titles, Version Number, Window, and "–" for "Label Repeating." Many of these commands invoke submenus which also contain a series of letters, each of which represents a submenu command choice. *See* VisiCalc Command Structure Chart (Tr. Ex. 140, pp. 3–3 and 3–4).

This particular expression of a menu structure is not essential to the electronic spreadsheet idea, nor does it merge with the somewhat less abstract idea of a menu structure for an electronic spreadsheet. The idea of a menu structure—including the overall structure, the order of commands in each menu line, the choice of letters, words, or "symbolic tokens" to represent each command, the presentation of these symbolic tokens on the screen (*i.e.,* first letter only, abbreviations, full words, full words with one or more letters capitalized or underlined), the type of menu system used (*i.e.,* one-, two-, or three-line moving-cursor menus, pull-down menus, or command-driven interfaces), and the long prompts—could be expressed in a great many if not literally unlimited number of ways.

 The fact that some of these specific command terms are quite obvious or merge with the idea of such a particular command term does not preclude copyrightability for the command structure taken as a whole. If particular characteristics not distinctive individually have been brought together in a way that makes the "whole" a distinctive expression of an idea—one of many possible ways of expressing it—then the "whole" may be copyrightable. The statutory provisions regarding "compilation," 17 U.S.C. §§ 101, 103, are not essential to this conclusion, but do reinforce it. A different total structure may be developed even from individual components that are quite similar and limited in number. To determine copyrightability, a court need not—and, indeed, should not—dissect every element of the allegedly protected work. Rather, the court need only identify those elements that are copyrightable, and then determine whether those elements, *considered as a whole,* have been impermissibly copied. *Atari Games Corp. v. Oman,* 888 F.2d 878, 882–83 (D.C.Cir.1989) (rejecting "component-by-component analysis," and ruling instead that focus must ultimately be on "work as a whole").

It is plain that plaintiff did not impermissibly copy copyrighted elements of VisiCalc. Lotus 1–2–3 uses a very different menu structure. In contrast with VisiCalc's one-line main menu that reads "Command: BCDEFGIMPRSTVW–", the main menu of Lotus 1–2–3, which uses a two-line moving-cursor menu system, reads: "Worksheet Range Copy Move File Graph Data Quit". *See* Appendix 2. Most of the submenus similarly present a list of up to about ten full-word menu choices, presented in order of predicted frequency of use rather than alphabetically. *See* Lotus 1–2–3 Command Tree Chart (Tr. Ex. 176, pp. 3–2 and 3–3). Other spreadsheet programs have also expressed their command structures in completely different ways. *Cf.* Multiplan (Tr. Ex. 132, p. 279–374), Framework II (Tr. Ex. 131, pp. QR7–QR8), SuperCalc4 (Tr. Ex. 133, Quick Reference Card Number 1), Excel (Tr. Ex. 79, Reference Guide, p. 90); Symphony (Tr. Ex. 130, Reference Manual, pp. 127–190); MathPlan

(Tr. Ex. 134, pp. 169–380); and PFS: Professional Plan (Tr. Ex. 135).

 I conclude that a menu command structure is capable of being expressed in many if not an unlimited number of ways, and that the command structure of 1–2–3 is an original and nonobvious way of expressing a command structure. Emery Decl. ¶ 15. Accordingly, the menu structure, taken as a whole—including the choice of command terms, the structure and order of those terms, their presentation on the screen, and the long prompts—is an aspect of 1–2–3 that is not present in every expression of an electronic spreadsheet. It meets the requirements of the second element of the legal test for copyrightability.

Finally, I consider the third element of the legal test—whether the structure, sequence, and organization of the menu command system is a substantial part of the alleged copyrighted work—here Lotus 1–2–3. That the answer to this question is "yes" is incontrovertible. The user interface of 1–2–3 is its most unique element, and is the aspect that has made 1–2–3 so popular. That defendants went to such trouble to copy that element is a testament to its substantiality. Accordingly, evaluation of the third element of the legal test weighs heavily in favor of Lotus.

Taking account of all three elements of the legal test, I determine that copyrightability of the user interface of 1–2–3 is established.

### VI. COPYING OF LOTUS 1–2–3

 As noted at the beginning of this Opinion, the parties' stipulation regulating this first phase of trial reserved for a later, jury phase, any issues of fact requiring jury determination with respect to any alleged copying of Lotus 1–2–3. If in this first phase the court had rejected Lotus' claim of copyrightability of nonliteral elements of the user interface, a jury phase would plainly have been required under that stipulation to determine whether any copying of source code or object code had occurred. Because, however, the court has decided instead that Lotus prevails on this issue, the court must next consider whether any issue remains that must be submitted to a jury before the court considers whether defendants are liable for infringement of Lotus' copyright in 1–2–3.

For the reasons stated below, the answer to that inquiry must be "no." Not only is the copying in this case so "overwhelming and pervasive" as to preclude, as a matter of law, any assertion of independent creation, see *Midway Manufacturing Co. v. Bandai–America, Inc.*, 546 F.Supp. 125, 141 n. 11, 149 (D.N.J.1982) ("overwhelming and pervasive" copying can preclude, as a matter of law, finding of independent creation, and can support grant of summary judgment for plaintiff, but such virtual identity not shown in this case), but also, defendants in this case have *admitted* that they copied these elements of protected expression.

Dr. James Stephenson, founder of defendant Stephenson Software, is the original developer of the program that was eventually released as VP–Planner. Like Kapor and Sacks, Stephenson recognized that VisiCalc, although a "pioneering spreadsheet approach," Stephenson Affdvt. ¶ 19 (Docket No. 287), was not sufficient to meet the financial planning needs of some companies and did not take advantage of technological advances in computer hardware. Accordingly, in January 1982, Stephenson began to develop his own electronic spreadsheet that he referred to as FIPS ("Financial Information and Planning System"). *See id.* at ¶¶ 13–59.

By January 1983, Stephenson had developed much of the user interface for his spreadsheet program including the menu command hierarchy. *See* Tr. Ex. 1014. By April 1983, Stephenson installed at his client's business an operational version of his spreadsheet program, which had substantially the same menu hierarchy as the January 1983 version. That hierarchy is differently expressed from the hierarchy of both VisiCalc and 1–2–3. *See* Tr. Ex. 1019; Stephenson Affdvt. ¶¶ 56–60.

Stephenson first saw 1–2–3 in operation in February 1983, after he had developed the menu hierarchy for FIPS. Throughout the rest of that year, he continued to im-

prove FIPS, changed its name to VP–Planner, and began to consider marketing his program. By December 1983, Stephenson entered into a letter of intent with Adam Osborne regarding publication of VP–Planner. Osborne thereafter organized defendant Paperback Software. Stephenson Affdvt. ¶¶ 66–82.

Throughout 1984, defendants continued to improve VP–Planner. In the autumn, they recognized the success of 1–2–3 and reached the conclusion that spawned this litigation: VP–Planner, in order to be a commercial success, would have to be "compatible" with 1–2–3. "The only way to accomplish this result," defendants believed, "was to ensure that *the arrangement and names of commands and menus in VP–Planner conformed to that of Lotus 1–2–3*." *Id.* at ¶ 117 (emphasis added). *See generally id.* at ¶¶ 99–130. Such compatibility would allow users to transfer spreadsheets created in 1–2–3 to VP–Planner without loss of functionality for any macros in the spreadsheet. Also, such compatibility would allow users to switch from 1–2–3 to VP–Planner without requiring retraining in the operation of VP–Planner.

To some degree at least, defendants' premises have proved incorrect in hindsight. That is, first, as Excel has proved, a spreadsheet program did not have to be exactly compatible with 1–2–3 in order to be a commercial success. Second, copying the menu structure was not the *only* way to achieve aspects of this desired compatibility. For example, defendants could have instead added a macro conversion capability as the creators of Excel have successfully done (the Microsoft Excel Macro Translation Assistant), and could have provided an on-line help function that would show users the VP–Planner equivalent for 1–2–3 commands. *See Excel Reference Guide* at 491, 425–26 (Tr. Ex. 79). *See also* Morgan Decl. ¶¶ 3–7 (Docket No. 308) (Lotus itself created a "macro conversion utility" to translate macros among different-language editions of 1–2–3 (*e.g.,* North American, international English, French, German, Italian, Spanish, and Swedish)); Turner Decl. ¶ 10 (Docket No. 309). These points

do not weigh significantly in the present decision, however, because even if VP–Planner otherwise would have been a commercial failure, and even if no other technological ways of achieving macro and menu compatibility existed, the desire to achieve "compatibility" or "standardization" cannot override the rights of authors to a limited monopoly in the expression embodied in their intellectual "work."

Defendants admit that, once these fateful decisions were made by Stephenson and Osborne, defendants converted VP–Planner into a program more like 1–2–3—indeed, a program that they have publicly advertised as a "workalike for 1–2–3." *VP Planner* Manual 1.11 (1985) (Tr. Ex. 9). It is incontrovertible that, in the process, they copied the expressive elements of 1–2–3 that the court has concluded are copyrightable:

> [M]aking the changes required for macro compatibility meant that we had to revise existing elements of the [VP–Planner] spreadsheet interface, including the hierarchical menu structure; ensure that keystroke sequences would bring about the same operational result in both programs; add certain functional elements found in Lotus 1–2–3 which VP–Planner did not yet support; and discard certain features which, although beneficial, were inconsistent with the macro compatibility requirement. . . .
>
> Several types of changes were required in the VP–Planner program to achieve keystroke macro compatibility. First, the menu structure had to be altered so that all menu commands would have the same first letter and be in the same location in the menu hierarchy as in Lotus 1–2–3.

Stephenson Affdvt. ¶¶ 144, 146. *See generally id.* at ¶¶ 142–157. After these changes were made, the VP–Planner manual could truthfully declare:

> VP–Planner is designed to work like Lotus 1–2–3, keystroke for keystroke. . . . VP–Planner's worksheet is a feature-for-feature workalike for 1–2–3. It does macros. It has the same command tree. It allows the same kind of calculations, the same kind of numerical information.

**70**

Everything 1–2–3 does, VP–Planner does.

*VP–Planner* Manual at xi, 1.11.

The court's comparison of the 1–2–3 menu command hierarchy and the VP–Planner menu hierarchy confirms that VP–Planner "has the same command tree" as 1–2–3—that is, that defendants copied the expression embodied in the 1–2–3 menu hierarchy. It is true that there are some differences between 1–2–3's menu structure and VP–Planner's menu structure. For example, most VP–Planner menu lines begin with a help ("?") command, and some additional commands are included at the end of some menu lines (*i.e.*, "DBase, Multidimensional" on the "/File Erase" menu line; and "Page #, No Page #, Row/Col. #, Stop Row/Col. #, Background" on the "/Print Printer Options Other" menu line). Other differences between the two programs appear in the start-up screens, the placement on the screen of the menu lines, the exact wording of the long prompts, the organization of the help screens, the increased width of the VP–Planner screen, and the ability of VP–Planner to hide certain columns. *See* Stephenson Affdvt. ¶¶ 161–176. The works are, nevertheless, substantially, indeed, strikingly, similar. As Judge Learned Hand held in a copyright case involving a pattern on a bolt of cloth that was used to make dresses, infringement may be found despite some differences between two works:

> the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same. That is enough; and indeed, it is all that can be said, unless protection against infringement is to be denied because of variants irrelevant to the purpose for which the design is intended.

*Peter Pan Fabrics*, 274 F.2d at 489, *quoted in part with approval, Concrete Machinery*, 843 F.2d at 607. *See also Atari v. Philips*, 672 F.2d at 618 ("[A] laundry list of specific differences ... will not preclude a finding of infringement where the works are substantially similar in other respects.... When analyzing two works to determine whether they are substantially similar, courts should be careful not to lose sight of the forest for the trees.").

From the perspective of both an expert and an ordinary viewer, the similarities overwhelm differences. Thus, as in *Peter Pan Fabrics*, the two works at issue are substantially similar. Indeed, by using the option in VP–Planner that allows a user to move the menu from the bottom of the screen to the top of the screen, a user could easily think 1–2–3 rather than VP–Planner was the program in use. Certainly purchasers of a book designed to teach users how to master *1–2–3*, which is distributed with demonstration copies of *VP–Planner*, would be likely to overlook the disparities between 1–2–3 and VP–Planner. *See* L. Ingalsbe, *Lotus 1–2–3 with Version 2.0 for the IBM PC* (1987) (Tr. Ex. 215).

Moreover, even if some elements of VP–Planner were very different, it would not give defendants a license to copy other substantial elements of 1–2–3 verbatim. If one publishes a 1,000–page book of which only a 10–page segment is an unauthorized reproduction of copyrighted material, and if the 10–page segment is a qualitatively substantial part of the copyrighted work, it is not a defense to a claim of infringement that the book is 99% different from the copyrighted material. *Sheldon*, 81 F.2d at 56 ("no plagiarist can excuse the wrong by showing how much of his work he did not pirate"); *SAS Institute*, 605 F.Supp. at 829–30. Thus, defendants' proof that VP–Planner has many features that are different from Lotus 1–2–3 is off point. The more relevant question is: does it have significant features that are substantially similar? I conclude, on the record before me, that there is no genuine dispute of material fact on this question. The answer to this question must be "yes."

Accordingly, I conclude that it is indisputable that defendants have copied substantial copyrightable elements of plaintiff's copyrighted work. I therefore conclude that, subject to consideration of other contentions advanced by defendants, liability has been established.

## VII. A POSTSCRIPT ON THE NATURE OF DECISIONMAKING IN THIS CASE

### A. Policy Arguments and Limitations on the Role of Courts

Although Parts I through VI of this Opinion are sufficient to demonstrate that defendants have impermissibly copied copyrightable elements of expression embodied in 1-2-3, it may be useful to pause, before reaching the merits of defendants' proffered defenses to liability, to consider the proper use of policy in determining statutory meaning.

As noted in Part III(A)(1), *supra,* the court is directed to look to the "object and policy" of the law in determining the manifested meaning of the law. *Kelly,* 479 U.S. at 43, 107 S.Ct. at 358. The court must, however, be careful that its weighing of the "object and policy" implicit in the law does not override the mandates that are either explicit in the statutory text or implicit in the provisions of the whole law.

Defendants' arguments in this case have urged the court to violate that limitation on the judicial use of policy considerations. That is, in the name of the "object and policy" of copyright law, defendants have argued: (1) that the idea-expression distinction creates unnecessary and counter-productive uncertainty that could be avoided by a bright-line test of copyrightability; (2) that the policy of promoting creativity favors extremely narrow copyright protection in computer programs for anything beyond source code and object code; and (3) that the policy of encouraging standardization mandates the conclusion that a user interface is not copyrightable. Also, in advancing these policy arguments, defendants have obscured the nature of important issues in the case by strained analogies and word games.

Policy arguments advanced without focusing on whether they are inconsistent with the mandates of legislation—along with strained analogies and word games— are fundamentally flawed because they do not take account of limitations on the role of courts, to which counsel as well as courts are obliged to be sensitive. Courts must enforce the mandates of legislation, and even when answering questions of law not answered by those mandates, must do so in a way that respects legislative policy choices, whether explicit or implicit.

Each of defendants' policy arguments addressed below suffers from this fatal flaw.

### B. Strained Analogies and Word Games

The reasoning that lawyers propose in arguments and judges use in deciding cases often builds on simile, metaphor, and allusion. All such reasoning is within the scope of what we call analogy, in the broadest sense. When strictly logical deductions from authoritative declarations of law—in constitutions, statutes, and precedents—do not provide answers to questions of law that must be decided in the case before the court, the court turns to analogy. *Cf. Kelly,* 479 U.S. at 43, 107 S.Ct. at 358 ("we must ... look to the provisions of the whole law"). Thus, similes, metaphors, and other forms of allusion are appropriately a part of our efforts to communicate ideas. They are not to be mistaken, however, for logically compelled inferences from authoritative declarations. They are aids to understanding the meaning, not yet authoritatively determined, of the authoritative declarations as applied to circumstances those declarations did not explicitly address.

Defendants strongly urged the court to accept an analogy between a computer program and a "useful article." As explained in Part IV(A) of this Opinion, that proposed analogy is deeply flawed because of an unstated implicit premise that the fact that a computer program is "useful" utterly precludes copyrightability of any expressive elements in it. In the same breath, though, defendants concede, that source code and object code are copyrightable. This concession is itself a demonstration of the vulnerability of the "useful article" argument. The concession makes clear a flaw in the analogical argument for treating a computer program that is "useful" as necessarily nothing more than a "useful article." If no explanation is offered for the exception other than precedent, the

analogy itself is challenged by the precedent.

Thus, labeling a computer program as a "useful article" in relation to a claim for copyrightability of nonliteral elements of the user interface, but not a "useful article" in relation to a claim for copyrightability of source code and object code, is engaging in a word game rather than focusing on the merits of the copyrightability issue.

An even more striking word-game argument is defendants contention that in copying the 1–2–3 user interface, they have only copied a "language," and that languages are not copyrightable. *See, e.g.,* Deposition of Steven Cook at 153:23–154:10 (Docket No. 327); Kocher Affdvt. ¶¶ 13–18 (Docket No. 272); Defendants' Post–Trial Brief at 87–103 (Docket No. 325). Although defendants have not explicitly stated all the essential steps of this argument, by filling the gaps in trying to understand the argument, one may infer the following elements and corollaries of the argument:

(1) Although expression is copyrightable, the language in which the expression is written is not copyrightable. Thus, a book written in English or French may be copyrightable, but the English and French "languages" are not works in which copyright may subsist.

(2) Like books, computer programs, written in computer programming "languages," may be copyrightable, but only the "sets of statements or instructions," and not the "language" in which they are written, are copyrightable.

(3) 1–2–3 has a macro capability or facility that allows a user to "write" her or his own macros. When the user writes a macro, he or she is actually writing a kind of computer "program." *See* 1–2–3 Release 1A User's Manual at 117 (macro "facility gives the 1–2–3 user a true programming capability") (Tr. Ex. 72); 1–2–3 Release 2.01 User's Manual at 3–10 ("1–2–3 includes a number of macro commands that create a powerful programming language") (Tr. Ex. 72B).

(5) The macro, or "program," that the user writes may be copyrightable if original and nonobvious. The "language" in which the macro is written is never copyrightable.

(6) Thus, when defendants copied the menu command hierarchy from 1–2–3, they did not copy a copyrightable element that embodied expression, but rather, copied only the "macro facility language" of 1–2–3, a non-copyrightable element in the public domain.

The vulnerable steps of this argument include, at a minimum:

(1) That "language" has a single, invariable meaning in all discourse about "languages";

(2) That not only languages such as English and French but all other languages as well—including Esperanto, and *Reiss'* coined words, 276 F. at 718, and Pascal—are automatically ineligible for copyright protection (as to vulnerability of this step of the argument, defendants, though invited at trial to do so, have cited no precedent that supports the contention that a "language," even if original, is not copyrightable);

(3) That "language" and "sets of statements or instructions" are opposites, and never the twain shall meet—that is, anything that is a "set of statements or instructions" is not a "programming language," and anything that is a "programming language" is not "a set of instructions."

Just to state these implicit elements of defendants' argument is sufficient to demonstrate that the argument depends on arbitrary definitions of words, adopted for undisclosed reasons. In human experience, words have variable meanings; dictionaries seldom list a single definition for a word. An argument that depends on the proponents' undisclosed definitions of words—and even different definitions as a word is used in different steps of the argument—becomes a word game that obscures the substantive meaning of the argument and is an obstruction rather than an aid to the court's use of the adversary process to inform and thus improve decisionmaking.

Having explored the argument fully to try to understand its true nature, I conclude that defendants' "language" argument about the macro facility of Lotus 1-2-3, like defendants' "useful article" argument examined in Part IV(a), *infra*, is totally without merit.

## C. Policy Arguments for Bright–Line Rules

One of the themes in defendants' bundle of policy arguments is a plea for bright-line certainty. Indeed, it is a persistent theme throughout defendants' submissions: Software developers would like to know what they may and what they must not copy. The idea-expression distinction, defendants argue, fails to achieve this policy goal; therefore, the court should adopt instead the bright-line literal-nonliteral distinction.

The yearning for certainty is not unique to this case or to copyright law. But certainty has a price. It reflects a hope that the court will apply hard-and-fast rules despite circumstances that cry out for a judgmental standard of decisionmaking that takes account of circumstances an impartial observer would think relevant to a "just" disposition of the case—which, after all, is one of the declared objectives of the legal system. *E.g.* Fed.R.Civ.P. 1 ("just, speedy, and inexpensive determination of every action").

The more deeply one probes, whether as lawyer or judge, or as an interested observer or critic of the legal system, the clearer it becomes that in many circumstances hard-and-fast rules, despite their initial attractiveness and false promise of certainty, have consequences that offend one's sense of justice. For example, hard-and-fast rules, because they allow for little or no evaluation and discretion, sometimes fail to take account of the competing values underlying the relevant law, and fail even to attempt to find an accommodation that serves conflicting high-value interests as well as possible, and at the lowest possible detriment to each. Professionals in law are forced by the nature of their work to do more probing into the disadvantages of bright-line rules than other observers gen-

erally are likely to do. For this reason, professionals are less likely than other observers to expect decisionmaking based on hard-and-fast rules that, in hindsight, seems arbitrarily to disregard relevant circumstances and to deserve the pejorative label "legalistic."

In this case, defendants have nevertheless proposed a bright-line rule that would extend copyright only to source code and object code, and never to nonliteral elements of computer programs. That proposal must be rejected. Not only is the proposed distinction contrary to the statutory mandates discussed throughout this Opinion, but also, it reflects the false hopes that are endemic to trying to apply bright-line rules where judgmental, evaluative standards are more appropriate. *Nichols*, 45 F.2d at 121; *Peter Pan Fabrics*, 274 F.2d at 489.

In any event, as noted in Part II, Congress could have constitutionally drawn defendants' proposed bright-line—providing protection only to computer program code and not to nonliteral elements of computer programs—but Congress has not done so. Without a congressional mandate, it would be an abuse of authority for this court, in deciding this case, to use a bright-line test of copyrightability that makes the literal-nonliteral distinction decisive. Instead, the court must adjudicate within the area of protection mandated by Congress.

## D. Opinion Evidence and Premises of Legal Rulings

Defendants, though disavowing any intent to invite the court to engage in lawmaking, have gone to extraordinary lengths in this case to advance policy arguments that a court can appropriately consider only if, in order to decide the case *sub judice*, it must answer previously unanswered questions about the meaning of relevant constitutional, statutory, and judicial sources of authority. Whether such a determination of previously undetermined meaning of an authoritative declaration is described as lawmaking, as I believe it to be, or instead in some other way—for example, as determining what "old statutes

have since become" in circumstances materially different from those existing when the statute was enacted, R. Dworkin, *Law's Empire,* 248–50 (1986)—is of less consequence than how a court goes about deciding meaning for the case at hand. What "facts" or "evidence" shall the court consider? Shall the court consider expert opinions about what the circumstances were at the time the statute was enacted, and how they differ now?

Defendants' submissions have failed to address directly these basic questions about the appropriate role of courts. Implicitly, however, they have asked the court to consider policy arguments as freely as if the court were under no constraints in this respect. Defendants, for example, offered the following opinion testimony of a witness qualified as an expert in computer software development:

> If the law is interpreted to say that a developer may not make a new program that can use the data files and inputs accepted by existing programs, then computer advancement as we know it will be slowed. . . .

> I believe that such a decision would throw the entire software industry into confusion. . . . [T]here would be a chilling effect on development and advancement in many areas. . . .

> This case has implications about whether or not new, improved programs can read and execute data users created for themselves with an older program. The quantity of data to be affected by this decision is incomprehensively vast. It is not a case about "cheap copies".

> If aspects of screen displays that are governed by functionality (such as a command language like the 1–2–3 command structure) are held to be within the scope of copyright protection, then progress in application and systems computer programs could be dramatically slowed in the United States.

Bricklin Affdvt. ¶¶ 176–77, 179–80. *See also* Samuelson & Glushko, *Comparing the Views of Lawyers and User Interface Designers,* 30 Jurimetrics at 137 (concluding on basis of survey that leading user interface designers oppose strong copyright protection for elements of a user interface because such protection would be harmful, rather than helpful, to the industry).

■ By rulings during trial, the court received opinion evidence of this kind into the "record" in the broadest sense, even though excluding it from consideration in relation to any material adjudicative fact that might be in dispute. Not surprisingly, defendants, though explicitly invited to do so, were never able to identify any "adjudicative fact" question, as that term is used in Rule 201 of the Federal Rules of Evidence, to which opinion evidence such as this would be relevant. The court nevertheless received this evidence, over plaintiff's objection on the ground of irrelevance, because courts are free to consider "evidence" of this type when deciding "legislative" (or "premise") facts. That is, courts may consider such evidence to resolve disputable assertions of an evaluative nature (either about the past or about the future) or assertions about historical facts, or predictions about future consequences of adopting one or another rule of law, as premises for deciding what legal ruling to make. *Cf.* F.R.E. 201(a), Notes of Advisory Committee (explaining "legislative facts"). *See also In re Asbestos Litigation,* 829 F.2d 1233, 1245–52 (3d Cir.1987) (concurring opinion of Becker, J.), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988). This is not to say, however, that either the trial court that allows the evidence to be received into the record or an appellate court on review is limited by the rules of admissibility and the standards of review that apply to disputed issues of "adjudicative" fact. *Chastleton Corp. v. Sinclair,* 264 U.S. 543, 548, 44 S.Ct. 405, 406, 68 L.Ed. 841 (1924) ("the Court may ascertain as it sees fit any fact that is merely a ground for laying down a rule of law"). *Cf. Lockhart v. McCree,* 476 U.S. 162, 168–69 n. 3, 106 S.Ct. 1758, 1762–63 n. 3, 90 L.Ed.2d 137 (1986) ("We are far from persuaded, however, that the 'clearly erroneous' standard of Rule 52(a) applies to the kind of 'legislative' facts at issue here."). *See also Dunagin v. City of Ox-*

*ford, Mississippi,* 718 F.2d 738, 748 n. 8 (5th Cir.1983) (en banc) ("legislative" fact discussion by Reavley, J.) ("If the legislative decision is not binding at this stage, at least it carries great weight. Certainly it cannot be thrust aside by two experts [who were called as witnesses before the trial court] and a judicial trier of fact."), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984).

The court having received defendants' proffered evidence into the record for the limited purpose of considering its weight, if any, as bearing on premises of any legal ruling the court might find it necessary to make in deciding the case, plaintiff responded with sharply contrasting opinions in its post-trial brief:

*First,* the tremendous growth and success of the U.S. software industry is the direct result of the creative and original efforts of its software developers, laboring under the protection of the copyright laws. Innovation has been the key to market success....

*Second,* to the extent that defendants attempt to characterize this struggle as pitting large heartless corporate giants against lonely and defenseless developers working out of their dens and basements, the defendants do not understand what is at stake here. If the elements of a computer program at issue here were to lose their copyright protection, the biggest losers of all would be the small developers. The history of this industry has been one of creative designers who identify an unfilled need in the market and then design and build a superior product to fill that need.... [T]he developers' ability to realize substantial rewards for their creative efforts has depended entirely upon the legal protection copyright has afforded their work.

If the defendants could rewrite the law, however, those days would be over. The first time a developer demonstrated an attractive new product at Comdex or Softeach or some other industry gathering, hundreds of programmers in corporate research laboratories around the world would set to work creating their own versions of the program to compete with the original. A major firm, with a staff of talented programmers, could fairly promptly create a clone of almost any new program and, in so doing, rob the author of much of the value of his creative efforts. The original author might have a head start, but that would provide little comfort once the major firms hit the market with their "new" products.... If copying were legal, the creators would lose out. It is as simple as that.

It is no accident that the world's strongest software industry is found in the United States, rather than in some other jurisdiction which provides weaker protection for computer programs. The system is working, and there is no reason to change it.

Plaintiff's Post–Trial Brief at 87–89; *see also* Tarter Decl. ¶¶ 72–73 (Docket No. 289) ("[I]nterface design represents one of the most crucial aspects of software design. In order to promote innovation and the evaluation of better software products, it is important that we protect the investment that the best developers make in interface design."); Clapes, *Software, Copyright, & Competition* at 202–03 (arguing that the user interface, which is often the most important feature of a computer program, requires strong copyright protection to encourage further innovation and advancement).

The *opinion testimony offered* in this case failed completely to focus on circumstances existing at any time Congress acted to enact or amend any part of the copyright law. For this reason, it has little, if any, value in illuminating issues of law presented in this case. It is relevant, of course, that both the text and history of the copyright law manifest a purpose of encouraging innovation and of doing so through copyright protection. At the time of congressional action, however—even as late as the 1976 Act and the 1980 amendments—it was not possible to know how the computer programming industry would change over the ensuing years, and what exact scope of protection would best advance the policy goals in newly developed

and now foreseeably developing circumstances. In light of that uncertainty, shall the court consider expert opinions about what the law ought to be today? What if those opinions appear to be inconsistent with the accommodation, struck by the statute now in effect, among competing and to some extent conflicting public policy justifications for broader or narrower copyright protection?

I conclude that a court would be going well beyond even the precedents most receptive to consideration of legislative history if it took into account expert opinions of persons experienced in the field of computer software development that are manifestly inconsistent with the accommodation that Congress struck when it enacted the Copyright Act of 1976 and the most recent amendments of the copyright law. In the 1976 Act, Congress manifested an intention to encourage innovation in the computer programming field, and to do so through copyright law that explicitly gives substantial protection to innovative *expression* in intellectual "works," including computer programs. Congress made this decision despite expert testimony that extending copyright protection to computer programs might have "disastrous consequences ... on standardization in electronic data processing," *Copyright Law Revision: Hearings on S. 597 Before the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary,* 90th Congress, 1st Session 589 (1967) (Testimony of Professor Anthony Oettinger), despite academic criticism of the decision to extend copyright protection to computer programs, Breyer, *Uneasy Case for Copyright,* 84 Harv.L.Rev. at 340–351 (concluding that "[c]omputer programs should not receive copyright protection at the present time"), and despite explicit proposals that copyright protect only "the instructions themselves" while leaving others free to otherwise "replicate [another's] program exactly." *Hearings on S. 597* at 571–73 (Statement of EDUCOM) ("Broad copyright protection for programs is unwise and improper ... [H]ad programming been constantly carried out under the threat of infringement actions charging

plagiarism of existing copyrighted programs, it is doubtful whether the growth of programs and programming techniques of recent years would have been possible."). The 1980 amendments, too, plainly went farther in protecting the interests of the creators of an original software product than defendants' experts now propose (and than some experts at the time proposed, *e.g.*, CONTU, *Final Report* at 56–76 (Hersey, C., dissenting)), even though they did not go as far as proposed by others to whose views Congress then had access.

■ When a court determines the meaning of the copyright statute in a new context, different from what could have been known to even the most prescient observer at the time Congress acted, the court must respect the congressional mandate—especially with respect to congressional determinations of premise facts—and is constrained to search not for what the court might now independently consider to be the best accommodation of competing interests but instead to determine an accommodation in this new context that is consistent with the accommodation that Congress enacted for the context to which it spoke. To the extent that expert opinions illumine the comparison between the context to which Congress spoke (the circumstances of software development then existing and predictable future circumstances) and the current context (the changing circumstances of software development now existing and now predictable for the future) the court may and should take them into account. To the extent, however, that expert opinions propose solutions inconsistent with the congressional accommodation, they must be disregarded.

■ On the basis of the complete record now before me, I conclude that defendants' policy arguments in this case are inconsistent with the accommodation struck by Congress in passing the Copyright Act and its amendments. Moreover, defendants have not demonstrated any significant changes in the premise facts upon which Congress acted, and upon which CONTU rested its recommendations. If anything, user interfaces have become

more expressive and more communicative since 1976 and 1980. I thus conclude that I must disregard defendants' experts' predictions of doom for the computer programming industry if copyright is extended to the user interface and other nonliteral elements of computer programs that embody expression, just as Congress disregarded Professor Oettinger's gloomy prediction of "disastrous consequences" and Commissioner Hersey's dissent. Rather, this legal issue must be resolved in such a way as to extend copyright protection, clearly and unequivocally, to those nonliteral elements of computer programs that embody original expression.

## E. Defendants' Policy Arguments Founded On the OTSOG Principle

One more of defendants' policy arguments deserves attention. Despite statutory mandates supporting the conclusion that elements of the user interface of 1-2-3 are copyrightable, defendants argue that the need to achieve compatibility and standardization compels rejection of that conclusion on policy grounds. Copyrightability of a user interface, they argue, will frustrate the public interest in allowing programmers to achieve innovation by "borrowing" and improving upon ideas of other programmers, and will undermine attempts to achieve compatibility and standardization among different programs. Especially in the vital area of user interfaces, defendants contend, copyrightability will have adverse consequences on encouraging innovation and on the broader public welfare.

Defendants' general contention—that "Progress of Science and useful Arts" cannot occur unless authors and inventors are privileged to build upon earlier progress and earlier innovation—has long been a virtually unchallenged premise in all branches of the law of intellectual property. An early expression of the point is Newton's declaration: "If I have seen further it is by standing on ye sholders of Giants." Sir Isaac Newton, Letter to Robert Hooke, February 5, 1675/1676, *quoted in* R. Merton, *On the Shoulders of Giants: A Shandean Postscript* 31 (1965).[3] This principle, which Merton has referred to as "OTSOG" (based on the modernized "on the shoulders of giants"), *id.* at 270, is also firmly established in our case law:

> In truth, in literature, in science and in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before.

*Emerson v. Davies*, 8 F.Cas. 615, 619 (C.C. D.Mass.1845) (No. 4,436) (Story, J.). *See also Ecclesiastes* 1:9–10 ("[T]here is no new thing under the sun. Men may say of something, 'Ah, this is new!'—but it existed long ago before our time."). Defendants, however, attempt to squeeze something from the OTSOG cornerstone that is not there.

Two possible applications of OTSOG in the field of computer programming are relevant to this case. First, innovation in computer programming is advanced as each programmer builds upon the ideas of previous programmers. Second, some of the innovative ideas may be expressed in a particular way that is so effective or efficient that the expression becomes standardized throughout the field even though the idea is capable of being expressed in other ways—that is, even though the particular expression is not an essential detail to every expression of the idea. Although both of these corollaries of OTSOG are impor-

---

**3.** Newton's now-famous phrase—"on ye sholders of Giants"—may have been copied, at least in its "total concept and feel," from Bernard of Chartres who, according to Merton, authored the OTSOG aphorism in the early twelfth century when he taught: "we are like dwarfs standing [or sitting, for those dwarfs who prefer safety to far-ranging vision] upon the shoulders of giants, and so able to see more and see farther than the ancients." Merton, *OTSOG* at 178–92. As Mer-

ton demonstrates, however, Bernard himself was standing on the shoulders of Priscian, a sixth-century grammarian, who wrote: "The younger [*e.g.,* the more recent] the scholars, the more sharp-sighted." *Id.* at 194–95 (brackets added by Merton). Of course, Priscian's passage presents only the idea; it took Bernard to express that idea in the metaphor of giants and dwarfs.

tant to the future of computer programming, neither was embraced by Congress (as explained below) in such a way as to override the public interest in conferring upon an author a right to a limited monopoly in the author's "work."

The metaphorical "shoulders of giants" on which successors may legally stand are not as broad as defendants contend. The legally relevant shoulders of programming giants are their ideas—and do not extend to all of their expressions. The encouragement of innovation requires no more. It is sufficient that programmers are privileged to borrow and improve upon previous ideas—such as the ideas for an electronic spreadsheet and a two-line moving cursor menu. Adequate room for innovation remains even though successors are barred from copying earlier authors' particular expressions—such as the particular structure, sequence, and organization of a menu command system. *Pearl Systems*, 8 U.S.P. Q.2d at 1525.

Of course, if a previous programmer's idea can be expressed in only one or a limited number of ways—such as the rotated "L" screen display or the use of the slash key to invoke the menu command system—then the expression, too, may be copied. *Morrissey*, 379 F.2d at 678–79. Where, in contrast, the idea is capable of countless ways of being expressed, only inexpensive cloning, and not innovation, would be advanced by allowing programmers to copy the particular way the ideas have been expressed by others.

The second corollary of the "OTSOG" principle relevant to this case concerns standardization. Defendants have argued that 1–2–3, and specifically, 1–2–3's menu structure and macro command facility, has set a *de facto* industry standard for all electronic spreadsheets. Thus, defendants had no choice, they argue, but to copy these expressive elements from 1–2–3. Had they not copied these elements (including the macro facility), users, who had been trained in 1–2–3 and had written elaborate macros to run on 1–2–3 spreadsheets, would be unwilling to switch to VP–Planner. VP–Planner would be a commercial failure. Neither the factual nor the legal predicate of the argument is supportable.

First, defendants' argument ignores the commercial success of Excel, an innovative spreadsheet program that is not compatible with 1–2–3, either in its menu structure or in its macro command facility. Also, defendants argument ignores the alternatives to direct copying that were legally available to them.

As already explained, to the extent that VP–Planner was concerned with compatibility for macros written originally for 1–2–3, VP–Planner could have provided for a translation device that could read 1–2–3 macros and convert them, automatically, into macros that could be run on VP–Planner. Microsoft Corporation successfully included such a capability in Excel and Lotus itself has written such a capability for translating macros among different-language versions of 1–2–3. Defendants have not offered persuasive evidence to show that they could not have done the same with VP–Planner. That "[i]t would have been an extremely complicated task" and would have cost defendants more to do so, Dauphinais Affdvt. ¶ 163, is not a reason for denial of copyright protection to 1–2–3. Copyright protection always has consequences of this kind.

Moreover, to the extent that VP–Planner is an incremental improvement upon 1–2–3 because of its multidimensional database capabilities, defendants could have (1) sought a license to use 1–2–3's menu structure and command facility; (2) offered to sell their new expression of ideas to Lotus for inclusion in future versions of 1–2–3; or (3) marketed VP–Planner as an "add-in" to 1–2–3.

An "add-in" program is a program designed to be used in conjunction with another program. For example, HAL is a program that is used in conjunction with 1–2–3—a user must have both HAL and 1–2–3—which allows a 1–2–3 user to enter commands in simple sentences such as "copy column B to E" rather than by selecting commands from the menus. Tr. Ex. 176. To encourage the creation of add-in programs (which, in turn, make 1–

2–3 a more attractive program to potential customers), Lotus has published a product called Lotus Developer Tools that helps developers write add-in programs. Tr. Ex. 138. Thus, even if defendants found the first two alternatives unattractive or unattainable (for example, because of Lotus' nonconsent except on unfavorable terms, *see Stewart*, 110 S.Ct. at 1764 ("a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work")), they could have marketed their multidimensional database capability as an "add-in" for those users interested in that capability. Transaction and marketing costs of the third option would tend to screen out the new product unless its innovative features made it very attractive to potential users, but this functional effect of copyright law would be entirely consistent with the objects and policies of that law as manifested in the copyright statute and judicial precedents. By instead selling a stand-alone product that completely replaces 1–2–3, defendants have not merely sold and profited from only their incremental additional expression. Rather, they seek permission to profit also from copying Lotus' protected expression.

Defendants' standardization argument is flawed for another reason as well. As explained above, one object of copyright law is to protect expression in order to encourage innovation. It follows, then, that the more innovative the expression of an idea is, the more important is copyright protection for that expression. By arguing that 1–2–3 was so innovative that it occupied the field and set a *de facto* industry standard, and that, therefore, defendants were free to copy plaintiff's expression, defendants have flipped copyright on its head. Copyright protection would be perverse if it only protected mundane increments while leaving unprotected as part of the public domain those advancements that are more strikingly innovative.

Finally, the entire argument about standardization may be questioned on a more fundamental ground. Defendants have cited no statutory provision or precedent that has ever declared that standardization, when not achieved *de jure*, is necessarily in the public's best interest. The court is aware of no such precedent or legislative mandate. A moment's reflection is enough to disclose that the public interest in extensive standardization is a sharply debatable issue. *See, e.g.*, Tarter Decl. ¶¶ 34–45; *cf.* the QWERTY typewriter keyboard (discussed in Farrell, *Standardization and Intellectual Property*, 30 Jurimetrics 35, 36–38 (1989)). Decisive against defendants' contention, in any event, is that the particular way they propose that the court resolve this dispute would reduce copyright protection far below the mandate of the copyright act.

## VIII. OTHER DEFENSES

### A. *Lack of Subject Matter Jurisdiction*

Section 411 of Title 17 provides that an infringement action may not be brought unless the author has applied for registration of the copyright. If the application is denied, the infringement action may not be brought unless the author serves a copy of the complaint on the Register of Copyrights. "Copyright registration under § 411(a) is a [jurisdictional] condition precedent to filing an infringement action." *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 650 F.Supp. 838, 850 (D.Mass.1986).

Defendants argue that plaintiff's allegations of copyright infringement in 1–2–3's user interface are, in reality, allegations of copyright infringement in 1–2–3's "screen displays." Defendants further argue that plaintiff's registration certificate for 1–2–3 covers only the literal code of 1–2–3, that plaintiff has failed to register the "screen displays" of 1–2–3 as separate audiovisual works, and that this court consequently lacks jurisdiction over allegations of infringement of the "screen displays" of 1–2–3.

This contention borders on the frivolous. First, I emphatically reject defendants' premise, based on yet another word game, that equates the user interface of 1–2–3 with 1–2–3's "screen displays." In ruling that defendants have infringed plaintiff's copyright, I have not ruled that defendants are liable because they copied the "screen

displays" of 1–2–3. Rather, I have concluded that defendants copied protected nonliteral elements of expression in the user interface and the underlying computer program.

■ Second, I conclude that, in any event, plaintiff's registration certificates are sufficient to extend to the "screen displays" of 1–2–3.

By focusing only on "screen displays," defendants have failed to take due notice of the statutory language as it bears on whether copyrightable elements of computer programs include the "user interface" and other nonliteral aspects.

Depending on the sense in which the phrase "screen display" is used, it may be quite correct to say that

> copyright protection of a computer program does not extend to screen displays generated by the program.... This distinction results from the fact that the same screen can be created by a variety of separate and independent computer programs. It is somewhat illogical to conclude that a screen can be a "copy" of many different programs.

*Softklone,* 659 F.Supp. at 455–56.

It is not, though, the screen display itself, in this narrow sense, that is a copyrightable "computer program"—that is, "a set of statements or instructions ... to bring about a certain result," 17 U.S.C. § 101. The screen display, understood in this narrow sense, is useless for this purpose unless it is integrated with other parts of the computer program so as to become indirectly part of the means by which the user communicates instructions through the total program to bring about the desired result. Thus, the copyrightable element is not, strictly speaking, the screen display, narrowly understood, but the literal and nonliteral elements of not only the display but also the distinctive way of creating it. Indeed, the *Softklone* court recognized this point:

> Therefore, it is this court's opinion that a computer program's copyright protection does not extend to the program's screen displays, and that copying of a program's screen displays, without evidence of

copying of the program's source code, object code, *sequence, organization, or structure,* does not state a claim of infringement.

659 F.Supp. at 456 (emphasis added).

■ Accordingly, just as using different dialogue does not sanitize from claims of infringement a play that copies the plot and characters from some other copyrighted work with resulting substantial similarity, the fact that the screen display *could* easily be created in many other ways—either to perform the same or to perform very different functions—does not sanitize it from claims of copyright infringement. The critical question, instead, is whether copyright protection is available against creating and using such a screen display—including the manifestation of structure, sequence, and organization in that display—as a part of the "set of statements or instructions" in a program that is designed "to be used directly or indirectly in a computer in order to bring about a certain result."

In any event, it is appropriate to consider "screen displays" in a broader sense that also includes the structure, sequence, and organization of the underlying program as manifested in the menus presented on the screen displays. I conclude that plaintiff's certificates of copyright registration in the "entire work" of 1–2–3 are sufficient to extend copyright protection to the "screen displays," in this broader sense, of Lotus 1–2–3. *See* TX 1–233–501 (Tr. Ex. 1, covering "entire work" of "1–2–3"), TX 1–233–502 (Tr. Ex. 2, covering "entire work" of "1–2–3 Release 1A"), and TX 1–694–602 (Tr. Ex. 3, covering "computer program text" of "1–2–3 Release 2").

The Copyright Office registers different works in different ways. One registration form may be used for nondramatic literary works (Form TX), different forms are required for audiovisual works (Forms PA and VA), and a different form for sound recordings (Form SR). *Compendium of Copyright Office Practices* § 604 (1984) (hereinafter "*Compendium II*"). *See also* 37 C.F.R. § 202.3(b)(1) (1989). As Con-

gress recognized, however, the seven distinct categories of copyrightable works that are listed as examples in section 102(a) are not mutually exclusive:

> The items are ... overlapping in the sense that a work falling within one class may encompass works coming within some or all of the other categories.

House Report at 53, *reprinted at* 5666. Thus, in registering a work that defies easy categorization, an author is directed to use the application form "in the class most appropriate to the type of authorship that *predominates* in the work being registered." *Compendium II* § 604 (emphasis added); 37 C.F.R. § 202.3(b)(2). *See also Compendium II* at § 708 ("The appropriate application form is generally determined by the nature of the authorship in which copyright is claimed."); 37 C.F.R. § 202.3(b)(2).

Most computer programs, like 1–2–3, are registered on Form TX as nondramatic literary works. *See Compendium II* at § 702.01 ("computer programs" should be registered as "nondramatic literary works" on Form TX). Some computer programmers, however—notably authors of video games—have instead registered for copyright the screen displays created by the program. *Stern Electronics*, 669 F.2d at 855 (plaintiff "eschewed registration of its program as a literary work and chose instead to register the sights and sounds of [the video game] as an audiovisual work"); *M. Kramer Manufacturing Co. v. Andrews*, 783 F.2d 421, 442 (4th Cir.1986) ("a copyright in the audiovisual display, which display is created by a computer program, protects not only the audiovisual from copying, but also the underlying computer program to the extent the program embodies the game's expression"). *See also, Atari Games v. Oman*, 888 F.2d at 882 ("Video games, case law confirms, rank as 'audiovisual works' that may qualify for copyright protection."); *Midway Manufacturing Co. v. Artic International, Inc.*, 704 F.2d 1009, 1012 (7th Cir.) (same), *cert. denied*, 464 U.S. 823, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983). This form of registration is particularly appropriate where the chief function, and the bulk of creative expression, of a particular computer program is the creation of a series of pictorial images on the computer screen as with video games.

Other authors of computer programs have applied for dual registrations for computer programs—one "literary" registration to cover the code, and a separate "audiovisual" registration to cover the screen displays. *See Softklone*, 659 F.Supp. at 455–56. This practice has since been rejected by the Copyright Office as duplicative. *See* Library of Congress, Copyright Office, *Registration of Computer Screen Displays*, Docket No. 87–4, 53 Fed.Reg. 21,817 (1988) ("all copyrightable expression owned by the same claimant and embodied in a computer program, including computer screen displays, is considered a single work and should by registered on a single application form"); Copyright Office, "Computer Programs and Related Screen Displays" (Tr. Ex. 1179) (single registration required for computer programs and their screen displays, including video game computer programs); *Compendium II* at § 607 (single registration covers single unitary work); *id.* at § 609 (copyright owner may "make only one basic registration per work"); 37 C.F.R. § 202.3(b)(6) (1989) (same); *Manufacturers Technologies*, 706 F.Supp. at 993; *Broderbund*, 648 F.Supp. at 1133.

In any event, when Lotus attempted to register separately the screen displays of 1–2–3 as an audiovisual work, the Copyright Office denied the registration. In a letter to plaintiff, Copyright Examiner Julia Huff explained:

> textual screen displays embodied within the computer program that generates them are covered by the registration for the program, without either the need or justification for separate registration for the displays. Because the displays are considered to be an integral part of the program, the authorship in the displays appears to be the same as that contained in the program.

Letter of Jan. 20, 1987, from Huff to plaintiff (Tr. Ex. 1092).

Accordingly, I conclude that Lotus has properly registered 1–2–3 for copyright protection, and that this court does have subject matter jurisdiction over all aspects of this infringement suit.

## B. Laches and Equitable Estoppel

Next, defendants argue that plaintiff is barred from any relief under the equitable doctrines of laches and equitable estoppel.

■ Defendants have the burden of proving laches. *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961). Thus, to prevail on this affirmative defense, defendants must prove by a preponderance of the evidence (1) that plaintiff inexcusably and unreasonably delayed in bringing this action; and (2) that the delay has prejudiced defendants. *Gardner v. Panama R. Co.,* 342 U.S. 29, 31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951); *Puerto Rican–American Insurance Co. v. Benjamin Shipping Co.,* 829 F.2d 281, 283 (1st Cir.1987). Defendants have failed to sustain either part of that burden.

■ According to defendants, beginning as early as April 30, 1985, "the trade press trumpeted Paperback's soon-to-be-released spreadsheet product [VP–Planner], making no secret that it would look and work like Lotus 1–2–3." Defendants' Post–Trial Brief at 120. VP–Planner was eventually released on October 30, 1985, but, defendants' charge, Lotus waited until January 12, 1987, 438 days later, to bring suit. *Id.*

Even if Lotus did wait fourteen-and-a-half months after learning of VP–Planner's release before commencing this litigation, I find that this delay was neither unreasonable nor inexcusable. Defendants cite *Worcester Brewing Corp. v. Rueter & Co.,* 157 F. 217, 219 (1st Cir.1907), for the proposition that a fifteen-month delay barred plaintiff's trademark infringement damage claim. That case, though, involved a relatively simple claim that defendant infringed plaintiff's trademark "Sterling Ale." Here, as evidenced by the court's lengthy Opinion, plaintiff's claim of copyright infringement in nonliteral elements of the user interface of 1–2–3 was a far more complicated claim, and one that required much more time to evaluate and prepare.

In circumstances such as these, a delay of fourteen-and-a-half months is not only reasonable, but, in fact, is likely to serve both party and public interests in appropriate use of public and private resources for resolution of disputes. As plaintiff aptly asserts: "Prudent business judgment, Rule 11 and basic common sense required Lotus first to ascertain that the threat to its intellectual property interest was serious and that its legal position was sound before filing suit." Plaintiff's Post–Trial Brief at 83. *See* Manzi Decl. ¶¶ 8–11 (Docket No. 293); *Roulo v. Russ Berrie & Co., Inc.,* 886 F.2d 931, 942 (7th Cir.1989) (twenty-one-month delay in filing infringement suit reasonable where "delay in filing was due to [plaintiff's] inquiry into the facts to determine the merit of her claim against [defendant]"), *cert. denied,* —— U.S. ——, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990).

■ Defendants nevertheless argue that, during the fourteen-and-a-half-month delay, plaintiff at least had a duty to notify defendants that plaintiff considered VP–Planner objectionable and that plaintiff intended to claim proprietary rights in 1–2–3's user interface. Not only did plaintiff fail to so notify defendants, defendants assert, but, in fact, plaintiff affirmatively led defendants to infer that VP–Planner was not objectionable. Accordingly, defendants contend, plaintiff is estopped from recovering against defendant. Defendants' Post–Trial Brief at 131 n. 66 (*citing Precious Metals Associates, Inc. v. Commodity Futures Trading Commission,* 620 F.2d 900, 908 (1st Cir.1980) (" 'A person is estopped from denying the consequences of his conduct where the conduct has been such as to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made.' ") (in turn *quoting Bergeron v. Mansour,* 152 F.2d 27, 30 (1st Cir.1945))).

In support of this contention, defendants cite a form letter that plaintiff's Supervisor of the Information Center sent to Paperback in January 1986 inquiring as to wheth-

er Lotus could use its copy of VP–Planner at any location at plaintiff's business. Tr. Ex. 201. Defendants argue that this letter "suggested that Lotus treated VP–Planner as it treated any other non-objectionable software product." Defendants' Post–Trial Brief at 131.

First, defendants have failed to offer any evidence that they did, in fact, draw that inference. Indeed, Steven Cook, Paperback's former president, testified that the form letter was simply returned to plaintiff with the appropriate box checked, and that Paperback did not even retain a copy of the letter. Cook Affdvt. ¶ 24 (Docket No. 299). Second, the court is unable to fathom how any reasonable person could draw that inference from Lotus' form letter. In any event, defendants have cited no authority to support the proposition that Lotus' letter, and Lotus' failure to notify defendants of its internal investigation into possible legal action during the fourteen-and-a-half month hiatus, constitute the kind of actions that support laches or equitable estoppel.

Another reason that defendants have failed to sustain a laches defense is that they have failed to demonstrate, any prejudice.

At the core of defendants' asserted prejudice is the following contention advanced by Paperback's former president:

> If Lotus had sued Paperback within three or four months after the release of VP–Planner, then Paperback would not have continued to market, sell, or develop VP–Planner in its Lotus-compatible form, whether or not the litigation had any merit.

Cook Affdvt. ¶ 33.

In light of defendants' belief that their spreadsheet product, to be successful, had to be compatible with 1–2–3, and defendants' strident insistence that 1–2–3's user interface is not copyrightable, this contention is simply not credible. In hindsight, perhaps, the expense of this lawsuit looms immense, but the court does not credit the testimony that the mere threat of a lawsuit, especially one that defendants assert they deemed frivolous, would have caused defendants' to retreat from marketing a 1–2–3 "workalike" spreadsheet program. I find that defendants have not shown that they were prejudiced by any delay.

Accordingly, I find that defendants have failed to sustain either element of a laches defense, or an equitable estoppel defense.

## IX. RESERVED RULINGS ON OBJECTIONS

Although ruling on most evidentiary objections during the trial, the court reserved ruling on some Rule 402 objections until after the court had an opportunity to consider the relevance of certain evidence in the context of the entire case. Most notable is evidence proffered by defendants with respect to VisiCalc, which plaintiff asserted was irrelevant to any issues raised by this case.

Although I agree that the "VisiCalc story," in the decisionmaking process reflected in this Opinion, has turned out to be not relevant to any of the equitable defenses, and not relevant to defendants' contention that Lotus itself copied aspects of VisiCalc with 1–2–3, I conclude that the "VisiCalc story" is relevant for background purposes. *See Granite Music Corp. v. United Artists Corp.*, 532 F.2d 718, 720–21 (9th Cir.1976) (admitting evidence of similar musical phrases appearing in works that predate both plaintiff's and defendant's song proper to show, for background purposes, that certain elements were of such ordinary and common occurrence that the probability of independent coincidental production was great). Also, I conclude that this evidence may appropriately be considered for the purpose of deciding premise facts upon which the conclusions of law with respect to copyrightability rest. *See generally* Part VII(D), *supra*.

With respect to all other reserved evidentiary rulings, the court concludes that they are moot in view of the findings and rulings stated in this Opinion. Moreover, even if the court were to rule explicitly that all of the evidence was admissible, I find as factfinder that none of this evidence alone, nor all of it taken together, would change any of the findings and conclusions contained in this Opinion. That is, even when

taken into account, this evidence has so little probative weight that it does not change any finding. Nevertheless, any party wishing an explicit ruling on any reserved evidentiary objection may so move on or before July 19, 1990, identifying specifically each objection on which a more explicit ruling is requested with references, if available, to specific pages in the transcript of the first phase of this trial.

## ORDER

For the reasons explained in this Opinion and on the findings and conclusions stated, it is hereby ordered:

(1) Liability for infringement by defendants' is established.

(2) Any party wishing an explicit ruling on any reserved evidentiary objection may so move on or before July 19, 1990, identifying specifically each objection on which a more explicit ruling is requested with references, if available, to specific pages in the transcript of the first phase of this trial.

(3) A conference with respect to further proceedings will be held as specified in the Joint Procedural Order of this date.

## APPENDIX 1

VisiCalc Screen, Main Menu
Tr. Ex. 1047, Tab A1

## APPENDIX 2

**1-2-3 Screen, Main Menu, Worksheet highlighted**
**Tr. Ex. 1047, Tab A2**

## APPENDIX 3

VP-Planner Screen, Main Menu, Worksheet highlighted
Tr. Ex. 1047, Tab A4

